UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CASEY'S DISTRIBUTING, INC., on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE OFFICE OF THE COMMISSIONER OF BASEBALL, doing business as MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; KANSAS CITY ROYALS BASEBALL CLUB LLC d/b/a KANSAS CITY ROYALS; MIAMI MARLINS, L.P. d/b/a MIAMI MARLINS; SAN FRANCISCO GIANTS BASEBALL CLUB LLC d/b/a SAN FRANCISCO GIANTS; BOSTON RED SOX BASEBALL CLUB L.P. d/b/a BOSTON RED SOX; ROGERS BLUE JAYS BASEBALL PARTNERSHIP d/b/a TORONTO BLUE JAYS; CHICAGO WHITE SOX LTD. d/b/a CHICAGO WHITE SOX; CLEVELAND GUARDIANS BASEBALL COMPANY LLC d/b/a CLEVELAND GUARDIANS; HOUSTON BASEBALL PARTNERS LLC d/b/a HOUSTON ASTROS; ANGELS BASEBALL LP d/b/a LOS ANGELES ANGELS OF ANAHEIM; ATHLETICS INVESTMENT GROUP, LLC d/b/a OAKLAND ATHLETICS; BASEBALL CLUB OF SEATTLE, LLP d/b/a SEATTLE MARINERS; THE CINCINNATI REDS, LLC d/b/a CINCINNATI REDS; ST. LOUIS CARDINALS, LLC d/b/a ST. LOUIS CARDINALS; COLORADO ROCKIES BASEBALL CLUB, LTD. d/b/a COLORADO ROCKIES; PADRES L.P., and the SAN DIEGO PADRES BASEBALL CLUB, L.P. d/b/a SAN DIEGO PADRES; MINNESOTA TWINS, LLC d/b/a MINNESOTA TWINS; WASHINGTON NATIONALS BASEBALL CLUB, LLC d/b/a WASHINGTON NATIONALS; DETROIT TIGERS, INC. d/b/a DETROIT TIGERS; LOS ANGELES DODGERS, LLC, and LOS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF FEDERAL ANTITRUST LAWS**<br><br>**JURY TRIAL DEMANDED** |

ANGELES DODGERS HOLDING CO. LLC )
d/b/a LOS ANGELES DODGERS; STERLING )
METS L.P. d/b/a NEW YORK METS; )
ATLANTA NATIONAL LEAGUE BASEBALL )
CLUB, LLC d/b/a ATLANTA BRAVES; AZPB )
L.P. d/b/a ARIZONA DIAMONDBACKS; )
BALTIMORE ORIOLES, INC. and )
BALTIMORE ORIOLES, L.P. d/b/a )
BALTIMORE ORIOLES; THE PHILLIES L.P. )
d/b/a PHILADELPHIA PHILLIES; )
PITTSBURGH BASEBALL PARTNERSHIP )
d/b/a PITTSBURGH PIRATES; NEW YORK )
YANKEES PARTNERSHIP d/b/a NEW YORK )
YANKEES; TAMPA BAY RAYS BASEBALL )
LTD. d/b/a TAMPLE BAY RAYS; CHICAGO )
BASEBALL CLUB, LLC d/b/a CHICAGO )
CUBS; MILWAUKEE BREWERS BASEBALL )
CLUB, INC., and MILWAUKEE BREWERS )
BASEBALL CLUB, L.P. d/b/a Milwaukee )
BREWERS; RANGERS BASEBALL EXPRESS, )
LLC and RANGERS BASEBALL, LLC d/b/a )
TEXAS RANGERS; and FANATICS, INC., )
                                    )
                    Defendants.      )
                                    )
                                    )

# TABLE OF CONTENTS

**Page(s)**

I.     NATURE OF THE ACTION ...........................................................................1

II.    PARTIES ......................................................................................................4

     A.     Plaintiff ..............................................................................................4

     B.     Defendants .........................................................................................5

III.   JURISDICTION, VENUE, AND INTERSTATE COMMERCE ......................8

IV.   FACTS .......................................................................................................10

     A.     MLB And Fanatics Have The Power And Authority To Decide Who Can Become An MLB Licensee..............................................................10

     B.     Fanatics Is A Dominant and Growing Online Retailer With Substantial Leverage Over The MLB Licensed Products Market............................13

     C.     Online Retail Is A Market Separate And Distinct From Brick-And-Mortar Retail.................................................................................................18

     D.     Casey's And Others Have Been Excluded From Selling On Amazon's Platform And Other TPOMs.............................................................22

     E.     The MLBP's Policy Prohibiting Retailers From Selling MLB Licensed Products On TPOMs Violates The Antitrust Laws And Harms Competition.......................................................................................32

     F.     No Procompetitive Justifications Excuse Defendants' Collusive Conduct ..........37

V.     THE RELEVANT ANTITRUST MARKET AND MARKET POWER .........................39

     A.     MLBP's Monopoly Or Market Power .................................................41

     B.     Amazon's Monopoly Or Market Power ...............................................42

     C.     Fanatics's Monopoly Or Market Power................................................43

VI.   DEFENDANTS WILLFULLY AND IMPROPERLY ACQUIRED OR MAINTAINED THEIR MONOPOLY POWER THROUGH ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT ...................................................................47

     A.     MLBP.................................................................................................47

     B.     Fanatics ..............................................................................................48

VII.    PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF ...................................50

VIII.   CLASS ACTION ALLEGATIONS ...........................................................51

    A.      Class Definition ....................................................................................51

    B.      Class Certification Requirements Under Rule 23 ..................................52

IX.     CAUSES OF ACTION ..........................................................................58

FIRST CAUSE OF ACTION Sherman Act § 1 – Conspiracy in Restraint of Trade
(As to All Defendants) ...............................................................................58

SECOND CAUSE OF ACTION Sherman Act § 2 – Monopolization
(As to All Defendants) ...............................................................................60

THIRD CAUSE OF ACTION Sherman Act § 2 – Attempted Monopolization
(As to All Defendants) ...............................................................................61

FOURTH CAUSE OF ACTION Sherman Act § 2 – Conspiracy to Monopolize
(As to All Defendants) ...............................................................................63

PRAYER FOR RELIEF ..............................................................................64

JURY DEMAND .........................................................................................65

Plaintiff Casey's Distributing, Inc. ("Casey's" or "Plaintiff") individually and on behalf of all others similarly situated, by and through its undersigned counsel, and upon personal knowledge as to facts known to Plaintiff and upon information and belief as to all other facts following investigation of counsel alleges as follows against Defendants.  Defendants are Fanatics, Inc. ("Fanatics"); The Office of the Commissioner of Baseball (which does business as Major League Baseball),  Major League Baseball Properties, Inc., and major league professional baseball franchises (collectively "MLB" or "MLB Defendants") ("Fanatics" and "MLB" are collectively referred to as "Defendants").  Plaintiff's counsel's investigation into the factual allegations contained herein is continuing.  Many of the relevant facts are known only by Defendants or are exclusively within their custody and control.  Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein and that additional evidence will be available after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Every year, consumers spend billions of dollars on MLB Licensed Products (as defined below).  Many of these transactions take place through online channels, especially third-party online marketplaces ("TPOM" or "TPOMs") such as Amazon.com, Inc. ("Amazon").  In fact, TPOMs, including Amazon's TPOM, serve as a sole source of income for many small merchants that sell MLB Licensed Products to consumers.

2.    MLB, Fanatics, and certain horizontally competing licensees and retailers have entered into various agreements that serve to severely limit Fanatics's and Defendants' competition on TPOMs.  These agreements violate the antitrust laws.  Fanatics is a gargantuan sporting goods licensee (including for MLB), manufacturer, wholesaler, distributor, and retailer,

which not only holds an MLB license to manufacture MLB Licensed Products, distributes those products, and retails those products, but is partially owned by the MLB.

3.      In addition to removing competition from the Amazon TPOM, which has approximately 41 percent of the market share for e-commerce (in second place is Walmart Inc. ("Walmart") with approximately 6.6 percent), Defendants have removed competition from other TPOMs.  Additionally, MLB restricts the online advertising terms small retailers can use, almost guaranteeing that their websites appear far below those affiliated with Fanatics, including those run by MLB and its Clubs.

4.      Fanatics's appetite for growth cannot be overstated.  Fanatics's value has tripled in the past few years alone, now estimated to be $27 billion.  Fanatics has used its funding to buy up competing licensees of MLB products, slowly securing its dominance in the licensed sporting goods market, not the least of which is MLB Licensed Products.

5.      The MLB aids and abets Fanatics because it invested more than $50 million in Fanatics to become a minority equity shareholder.  As Fanatics's value grows, so does the value of the MLB's equity share in Fanatics.  Thus, it is in the MLB's interest to assist Fanatics in its campaign to control as much of the online retail space as possible.  And Amazon's enormous online retail platform, including its TPOM, was a logical candidate to target for Fanatics's growth at the expense of Plaintiff and small retailers like Plaintiff.

6.      Fanatics now dominates Amazon's, Walmart's, and other TPOMs as a result of the agreements described herein.  As alleged herein, at least five licensees have agreements with Fanatics (also a licensee) that mandate that the licensees not sell to entities that will sell the products on or to Amazon as well as to certain online retailers.  Some of these agreements go so far as to mandate that the licensees' products be sold only to Fanatics, or else the licensees'

licenses would be revoked.  Indeed, Casey's has seen a written agreement that appears to be between Fanatics and its horizontally competing licensees to group boycott entities, such as Casey's, from competing with Fanatics and its colluding licensees in selling products on or to Amazon.  And, Licensees told Casey's that in enforcing the purported MLB policies, licensees were acting at the direction of Fanatics.  Fanatics captured this dominance by excluding smaller competitors like Casey's through the MLB's recently implemented restrictions that prohibit competing retailer entities like Casey's from selling on Amazon's TPOM, unless approved by the MLB to do so at its sole discretion.  The agreements described herein are designed to allow the MLB and Fanatics to reach downwards to attempt to restrict the conduct of retailers that horizontally compete with them, including those that lack privity with the MLB, Fanatics, and the constituent Teams.

7.     Plaintiff alleges a horizontal antitrust conspiracy in which MLB, Fanatics, and horizontally competing licensees collude to agree to boycott sales to TPOM retailers.

8.     Fanatics has gained monopoly power in MLB licensed apparel.  In January 2019, MLB and Nike agreed to a ten-year deal that made "Nike the league's official on-field apparel and merchandise designer beginning in 2020."  This deal also granted Fanatics the exclusive rights to design, manufacture, and distribute ***all Nike MLB fan gear***, with Nike retaining the exclusive right to supply MLB player uniforms, baselayers, training apparel, and footwear to the teams on-field.

9.     In January 2019, Fanatics reached an agreement with Walmart to be the exclusive seller on Walmart.com.  All NFL and MLB products previously and legitimately listed by sellers on Walmart.com, including, without limitation, those of Casey's, were inexplicably removed from Walmart.com, leaving only Fanatics's products left.

10.     Additionally, beginning in January 2022, Fanatics became the ***MLB's exclusive master licensee for MLB Hardgoods for the U.S. and Canada***, with certain exceptions.  The MLB directed that MLB Hardgoods licensees could only renew their licenses through Fanatics, a horizontally competing licensee.  That is, Fanatics has the exclusive right to determine who its competitors are in the MLB Hardgoods market.

11.     Now, Fanatics is in complete control of the commerce involving MLB licensed apparel and hardgoods.  Fanatics controls who can sell MLB Licensed Products not only on Amazon but everywhere.  Volume purchasers who are retailers often require that the seller offer products from the four major sports leagues and the NCAA.  Fanatics can now prevent those sellers from offering MLB Licensed Products.

12.     Casey's brings this action on behalf of itself and other online retailers of MLB Licensed Products (as defined below) who have been denied the opportunity to sell on TPOMs due to Defendants' anticompetitive conduct in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, and 3, and seeks only injunctive and declaratory relief against Defendants to restore competition on TPOMs to the status quo.

II.    **PARTIES**

   A.    **Plaintiff**

13.     Plaintiff Casey's is a Nebraska corporation with its principal address at 8921 J Street, #300, Omaha, NE 68127.  Casey's product line primarily focuses on licensed hardgoods, which includes automotive accessories, banners, blankets, collectibles, displays, full-size authentic and mini helmets, flags, home and office products, toys, drinkware, and items for dining, the kitchen, and tailgating.  Casey's also sells licensed apparel.  Casey's purchased MLB

licensed hardgoods directly from WinCraft, which was acquired by Fanatics on or around December 2020, and other licensees during the Class Period (defined below).

**B.      Defendants**

14.      Defendant The Office of the Commissioner of Baseball, doing business as Major League Baseball, is an unincorporated association composed of the thirty Major League baseball clubs (the "Clubs" or "Franchises").  MLB has unified operation and common control over the Franchises.  All do business as MLB.  The MLB has its headquarters at 245 Park Avenue, New York, NY 10167.

15.      Defendant Major League Baseball Properties, Inc. ("MLBP"), which is located at 1271 Avenue of the Americas, New York, NY 10020, is a wholly-owned subsidiary of Major League Baseball Enterprises, Inc. ("MLBE"), an entity in which each of the 30 current MLB Clubs owns an equal interest.  MLBP is, with limited exceptions, the exclusive worldwide agent for licensing the use of all names, logos, trademarks, service marks, trade dress, and other intellectual property controlled by the MLB Clubs, MLB's Office of the Commissioner, and MLBP (collectively "MLB Intellectual Property"), on retail products.

16.      Defendant **Kansas City Royals Baseball Club LLC (d/b/a Kansas City Royals)** is an MLB Franchise and located at One Royal Way, Kansas City, MO 64129.

17.      Defendant **Miami Marlins, L.P. (d/b/a/ Miami Marlins)** is an MLB franchise and located at Marlins Park, 501 Marlins Way, Miami, FL 33125.

18.      Defendant **San Francisco Giants Baseball Club LLC (d/b/a San Francisco Giants)** is an MLB Franchise and located at Oracle Park, 24 Willie Mays Plaza, San Francisco, CA 94107.

19.     Defendant **Boston Red Sox Baseball Club L.P. (d/b/a Boston Red Sox)** is an MLB Franchise and located at 4 Jersey Street, Boston, MA 02215.

20.     Defendant **Rogers Blue Jays Baseball Partnership (d/b/a Toronto Blue Jays)** is an MLB Franchise and located at 1 Blue Jays Way, Suite 3200, Toronto, Ontario, M5V 1J1 Canada.

21.     Defendant **Chicago White Sox Ltd. (d/b/a Chicago White Sox)** is an MLB Franchise and located at in 333 W. 35th Street, Chicago, IL 60616.

22.     Defendant **Cleveland Guardians Baseball Company LLC (d/b/a Cleveland Guardians)** is an MLB Franchise and located at 2401 Ontario Street, Cleveland, OH 44115.

23.     Defendant **Houston Baseball Partners LLC (d/b/a Houston Astros)** is an MLB Franchise and located at 501 Crawford Street, Houston, TX 77002.

24.     Defendant **Angels Baseball LP (d/b/a Los Angeles Angels of Anaheim)** is an MLB Franchise and located at 2000 Gene Autry Way, Anaheim, CA 92806.

25.     Defendant **Athletics Investment Group, LLC (d/b/a Oakland Athletics)** is an MLB Franchise and located at 7000 Coliseum Way, Suite 3, Oakland, CA 94621.

26.     Defendant **Baseball Club of Seattle, LLP (d/b/a Seattle Mariners)** is an MLB Franchise and located at 1250 1st Ave. S, Seattle, WA 98134.

27.     Defendant **The Cincinnati Reds, LLC (d/b/a Cincinnati Reds)** is an MLB Franchise and located at 100 Joe Nuxhall Way, Cincinnati, OH 45202.

28.     Defendant **St. Louis Cardinals, LLC (d/b/a St. Louis Cardinals)** is an MLB Franchise and located at 700 Clark Street, Saint Louis, MO 63102.

29.     Defendant **Colorado Rockies Baseball Club, Ltd. (d/b/a Colorado Rockies)** is am MLB Franchise and located at 2001 Blake Street, Denver, CO 80205.

30.    Defendants **Padres L.P., and the San Diego Padres Baseball Club, L.P. (d/b/a San Diego Padres)** located at 100 Park Blvd., Petco Park, San Diego, CA 92101.

31.    Defendant **Minnesota Twins, LLC (d/b/a Minnesota Twins)** is an MLB Franchise and located at in 1 Twins Way, Minneapolis, MN 55403.

32.    Defendant **Washington Nationals Baseball Club, LLC (d/b/a Washington Nationals)** is an MLB Franchise and located at 1500 South Capitol Street SE, Washington, DC 20003.

33.    Defendant **Detroit Tigers, Inc. (d/b/a Detroit Tigers)** is an MLB Franchise and located at 2100 Woodward Ave., Detroit, MI 48201.

34.    Defendants **Los Angeles Dodgers, LLC, and Los Angeles Dodgers Holding Company LLC, (d/b/a Los Angeles Dodgers)** is an MLB Franchise and located at 1000 Vin Scully Ave., Los Angeles, CA 90090.

35.    Defendant **Sterling Mets L.P. (d/b/a New York Mets)** is an MLB Franchise and located at 41 Seaver Way, Queens, NY 11368.

36.    Defendant **Atlanta National League Baseball Club, LLC (d/b/a Atlanta Braves)** is an MLB Franchise and located at 755 Battery Ave. SE, Atlanta, GA 30339.

37.    Defendant **AZPB L.P. (d/b/a Arizona Diamondbacks)** is an MLB Franchise and a Delaware corporation located at 401 East Jefferson Street, Phoenix, AZ 85004.

38.    Defendants **Baltimore Orioles, Inc. and Baltimore Orioles, L.P. (d/b/a Baltimore Orioles)** is an MLB Franchise and located at 333 W. Camden Street, Baltimore, MD 21201.

39.    Defendant **The Phillies L.P. (d/b/a Philadelphia Phillies)** is an MLB Franchise and located at 1 Citizens Bank Way, Philadelphia, PA 19148.

40.     Defendant **Pittsburgh Baseball Partnership (d/b/a Pittsburgh Pirates)** is an MLB Franchise and located at 115 Federal Street, Suite 115B, Pittsburgh, PA 15212.

41.     Defendant **New York Yankees Partnership (d/b/a New York Yankees)** is an MLB Franchise and located at One E. 161st Street, Bronx, NY 10451.

42.     Defendant **Tampa Bay Rays Baseball Ltd. (d/b/a Tampa Bay Rays)** is an MLB Franchise and located at 1 Tropicana Drive, St. Petersburg, FL 33705.

43.     Defendant **Chicago Baseball Club, LLC (d/b/a Chicago Cubs)** is an MLB Franchise and located at 1060 W. Addison Street, Suite 1, Chicago, IL 60613.

44.     Defendant **Milwaukee Brewers Baseball Club, Inc., and Milwaukee Brewers Baseball Club, L.P. (d/b/a Milwaukee Brewers)** is an MLB Franchise and located at One Brewers Way, Milwaukee, WI 53214.

45.     Defendants **Rangers Baseball Express, LLC and Rangers Baseball, LLC (d/b/a Texas Rangers)** is an MLB Franchise and located at 1000 Ballpark Way, Suite 400, Arlington, TX 76011.

46.     Defendant **Fanatics, Inc.** is a Delaware Corporation, established and headquartered at 8100 Nations Way, Jacksonville, FL 32256, in 2011.  Fanatics is a manufacturer, supplier, distributor, and retailer of licensed sportswear, sports equipment, and merchandise, including MLB Licensed Products.  Several of Fanatics's subsidiaries or affiliated entities have headquarters in New York, NY.

## III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

47.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1337 and Clayton Act, 15 U.S.C. §26.

48.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391 (b), (c), and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

49.     Defendants' conduct was within the flow of, was intended to, and did in fact have a substantial effect on interstate commerce of the United States, including in this District.

50.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, airways, cable, wires, wireless spectrum, and the U.S. mail, to effectuate their unlawful scheme.

51.     This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, is located, and/or they or their co-conspirators committed overt acts in furtherance of their illegal conspiracy in the United States, including in this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

52.     Defendants have substantial and continuing locations and operations within New York that relate, at least in part, directly to the anticompetitive conduct alleged in this complaint. The MLB and MLBP are headquartered within this District.  The Sterling Mets L.P. (d/b/a New York Mets) and New York Yankees Partnership (d/b/a New York Yankees) have their headquarters in New York, and many of their fans reside in New York.  The MLB and the owners of the Teams regularly meet in New York to discuss the business.  Several of Fanatics's subsidiaries or affiliated entities have headquarters in New York.  Michael Rubin, who is Fanatics's founder, chairman, and chief executive officer ("CEO"), has a residence in New York.

Defendants operate several retail locations in New York, many affected sales occurred in or were

transacted in New York, many affected customers reside in New York, and overt acts taken in

furtherance of the Defendants' anticompetitive scheme took place in New York, including,

without limitation, negotiations concerning the alleged anticompetitive agreements.  All

Defendants have engaged in conduct sufficient to establish minimum contacts with both the

United States in general and with New York in particular.  All Defendants sell and ship millions

of dollars' worth of MLB Licensed Products to customers in New York.  All Defendants have

purposefully availed themselves of the benefits and protections of United States and New York

law, such that the exercise of jurisdiction over them would comport with due process

requirements, including notions of fair play and substantial justice.

IV.     **FACTS**

>    **A.     MLB And Fanatics Have The Power And Authority To Decide Who Can Become An MLB Licensee**

53.     The MLB Licensed Products industry operates much like other licensed

merchandise industries.  Trademark owners (e.g., individual sports teams) license their marks to

licensees who make products that are then sold to distributors, who then re-sell the products to

retailers, who in turn re-sell them directly to consumers.  But instead of competing

independently, the teams that comprise the MLB have formed a cartel to jointly organize the

licensing of their marks (as a single group) through Defendant MLBP.  Unlike real competitors

in an open and competitive marketplace, the Clubs' collusive marketing agreements

disincentivize competition between the Clubs.  The MLB's operation as a business cartel is key

to understanding the collusive agreements at issue in this complaint.

54.     Another relevant feature of the MLB Licensed Products industry is that firms

occupying upstream positions in the supply chain as manufacturers, suppliers, or trademark

owners also act as retailers selling directly to consumers.  Although the Clubs collectively license their marks to licensees who make products bearing the Clubs' logos, those Clubs also have historically sold those same products directly to consumers in their online and "brick-and-mortar" fanshops.

55.    The last 20 years have seen a dramatic shift from traditional "brick-and-mortar" businesses to "e-commerce," which is the buying and selling of goods or services using the internet.  Although the MLB's Clubs have historically sold merchandise online through their individual sites, by far the biggest player in the online retail market for MLB Licensed Products is Defendant Fanatics, Inc.

56.    MLBP serves as the representative of MLB and its 30 Clubs for the licensing of their logos, trademarks, emblems, or other indicia ("Intellectual Property").  In this role, the MLBP controls the Intellectual Property of the MLB and its constituent Clubs, including merchandising and licensing of MLB products that bear MLB Intellectual Property ("MLB Licensed Products").  For that reason, the MLBP maintains all or substantially all control over how MLB Licensed Products reach consumers, and it does so for the MLB itself and for each of the MLB's thirty competing Clubs.

57.    Within its authority to issue and renew MLB Intellectual Property Licenses, MLBP has the power to set the price of such licenses.  Through this power to set license prices and exclude competition, MLBP has the ability to determine which, as well as how many, licenses it will issue or renew.  Further, both as part of its authority to set prices and its power to exclude competition, MLBP can determine which individuals or entities can receive renewed licenses.

58.     Prior to the implementation of the anti-competitive scheme alleged herein, non-licensee companies, such as Casey's, were permitted to purchase MLB Licensed Products from licensees and distribute those products to retailers or retail the products online through TPOMs. As written, the MLB's policies do not mandate that only licensees can retail MLB Licensed Products online.  But in practice through the anti-competitive scheme alleged herein, the MLB Defendants, Fanatics, and colluding licensees are effectuating a system that limits the available online retailers on TPOMs.

59.     The MLB and each of its constituent Clubs can retail Licensed Products.

60.     MLB licensees, including but not limited to Fanatics, also compete in retailing Licensed Products.

61.     MLB Licensed Products are also sold at the retail level by various retailers who do not hold a license but who legitimately purchase MLB Licensed Products from licensees.  For example, Casey's does not hold a license but purchases MLB Licensed Products from various licensees.

62.     Prior to the alleged conspiracy, retailers who do not hold MLB licenses but legitimately purchase MLB Licensed Products had the freedom to retail them on TPOM.

63.     By deciding which individuals or entities can receive MLB Intellectual Property Licenses, MLBP has the ability to determine the level of competition occurring between and among licensees, including the MLB licensees participating in the MLB Licensed Products market.  Further, MLBP has the power to dictate the terms that govern the conduct of these MLB licensees.  As part of this power, MLBP has threatened or prevented MLB licensees from selling MLB Licensed Products to those who retail MLB Licensed Products on or through TPOMs.  In addition, MLBP has the power to favor certain MLB licensees over others.  For example, MLBP

has placed Fanatics—with whom the MLB has an investment interest (further described below)—in the favored position of operating or "powering" the MLB's Amazon "storefront," Walmart, and most of MLB's and the Clubs' e-commerce websites.  In this way, MLBP has ensured that one particular licensee, Fanatics, unlawfully monopolizes the online retail market for MLB Licensed Products.  In January 2019, MLB granted Fanatics the exclusive rights to design, manufacture, and distribute all Nike MLB fan gear, with Nike retaining the exclusive right to supply MLB player uniforms, baselayers, training apparel, and footwear to the teams on-field.  Around January 2022, MLB granted a hardgoods master license to Fanatics, allowing Fanatics in turn to sublicense hard goods in their exclusive discretion.

**B.      Fanatics Is A Dominant and Growing Online Retailer With Substantial Leverage Over The MLB Licensed Products Market**

64.      Fanatics was launched by Michael Rubin in 2011.  In 2014, Fanatics began developing its "vertical commerce" or "v-commerce" business model, pursuant to which Fanatics aimed to produce, manufacture, supply, wholesale, distribute, and retail licensed merchandise, including MLB Licensed Products.  Today, Fanatics has relationships with over 1,080 product vendors.  Fanatics offers products through its Fanatics and FansEdge brands, as well as sports collectibles and memorabilia through Fanatics Authentic and SportsMemorabilia.com.  Fanatics currently operates the e-commerce websites of major professional sports leagues (MLB, NASCAR, NBA, NFL, NHL, PGA, MLS, and UFC), major media brands (CBS Sports, Fox Sports, and NBC Sports), and over 150 collegiate and professional team properties.  It operates over 300 online and offline stores, including, but not limited to, Fanatics.com, MLBShop.com, NFLShop.com, and Fansedge.com.

65.      In 2015, MLB and Fanatics signed a deal, that would start in the 2016 season, under which Fanatics "will run all facets of [MLB's] licensed-product e-commerce business

through the '33 season."[1]  While Fanatics and MLB have been business partners since 2003, this deal allowed Fanatics to "buy and own inventory for MLB sites and perform merchandising and marketing under the aegis of MLB."[2]  Prior to this agreement, Fanatics had "been doing order fulfillment for the e-stores on MLB.com and its team sites."[3]

66.    Around the middle of 2017, the MLB invested approximately $50 million to acquire a minority equity stake in privately held Fanatics, a licensee that manufactures, supplies, wholesales, distributes, and retails MLB Licensed Products.  Fanatics became partially owned by the very league it once negotiated with at arms-length and which holds power over the licenses necessary for its success.  MLB receives a share of Fanatics's monopoly rents through licensing fees and increased royalty revenue, both in absolute dollars and as a percentage of sales.  Mr. Rubin explained it this way:

> They get a cut of everything we sell.  So the more we sell, the more money they/we make and I can tell you, the growth we've seen in both the NFL and MLB in this partnership has been, I think in a lot of ways better than anyone expected.[4]

67.    As a further benefit of this investment and because direct-to-consumer sales generate data about consumers, the MLB was able to leverage the greater consumer traffic going

[1] Terry Lefton, *Fanatics Signs Unprecedented 17-Year Deal to Run MLB's Online Licensed-Product Business*, SPORTS BUSINESS JOURNAL (Jun. 16, 2015), https://www.sportsbusinessjournal.com/Daily/Issues/2015/06/16/Marketing-and-Sponsorship/MLB-Fanatics.aspx.

[2] *Id.*

[3] *Id.*

[4] *Michael Rubin Interview*, Forbes: Sports Money (Sep. 30, 2020), https://www.forbes.com/sites/mikeozanian/2020/09/30/michael-rubin-dishes-on-his--evolving-game-plan-for-fanatics-and-life/?sh=15b496cf1147 (hereinafter "*Sports Money Interview*").

to websites controlled by the MLB Defendants and Fanatics to gather data that would, as Mr. Rubin puts it, "drive all aspects of their business."

68.    Majestic was the official on-field uniform of MLB from 2005 until 2019.[5]  In 2017, Fanatics bought VF Corp's (Majestic's parent company) Licensed Sports Group business.[6] This deal brought Majestic's MLB-licensed on-field uniforms and other apparel under Fanatics's ownership.  After this acquisition, on-field uniforms would continue to have been made by Majestic under Fanatics's ownership.

69.    In January 2019, MLB and Nike agreed to a ten-year deal that made "Nike the league's official on-field apparel and merchandise designer beginning in 2020."[7]  This deal also granted Fanatics the exclusive rights to design, manufacture, and distribute all Nike MLB fan gear, with Nike retaining the exclusive right to supply MLB player uniforms, baselayers, training apparel, and footwear to the teams on-field.

70.    In September 2020, Fanatics acquired assets of Vetta Brands, which include leading collegiate headwear retailer Top of the World.  In December 2020, Fanatics acquired

---

[5] Thomas Barrabi, *Who Makes MLB Jerseys?*, Fox Business (Jul. 9, 2020), https://www.foxbusiness.com/sports/who-makes-mlb-jerseys.

[6] Jon Harris, *Home Run: Majestic's Sale to Fanatics will Keep MLB Uniform, Fanwear Production in Palmer*, The Morning Call (Apr. 4, 2017, 11:01PM), https://www.mcall.com/business/mc-majestic-mlb-uniform-provider-bought-20170404-story.html; *See also,* Associated Press, *Fanatics Buying Majestic Athletic Plant that Makes MLB Uniforms*, ESPN (Apr. 4, 2017), https://www.espn.com/mlb/story/_/id/19078506/new-owner-plant-makes-major-league-baseball-jerseys.

[7] Tom Bassam, *Report: MLB Set Up Nike Uniform Deal as Under Armour Withdraw*, Sports Pro Media (May 28, 2018), https://www.sportspromedia.com/news/mlb-nike-under-armour-official-uniform-fanatics/; *See also,* Mike Chiari, *MLB, Nike Announce 10-Year Uniform, Merchandise Contract*, Bleacher Report (Jan. 25, 2019), https://bleacherreport.com/articles/2817600-mlb-nike-announce-10-year-uniform-merchandise-contract#:~:text=Major%20League%20Baseball%20and%20Nike,merchandise%20designer%20beginning%20in%202020.

rival manufacturer WinCraft, Inc. ("WinCraft"), a major leader in the hardgoods and promotional product business for over 60 years. Fanatics's acquisitions of Top of the World and WinCraft showed that "Fanatics is concentrating on the acceleration of its vertical commerce business and strengthening its manufacturing and distribution operations."[8]

71.    Since the MLB's investment in Fanatics, and at least in part due to MLBP's, Amazon's, and Walmart's conduct favoring Fanatics, Fanatics's valuation and market strength has since ballooned. Fanatics was valued at $6.2 billion in August 2020 after raising $350 million in a private funding round. Fanatics raised $320 million in additional funding in May 2021, giving it a valuation of $12.8 billion. In August 2021, Fanatics secured an additional $325 million and is now valued at $18 billion.[9] In March 2022, Fanatics raised another $1.5 billion in a funding round that values the company at $27 billion.[10]

72.    Fanatics has used its funding to expand upon its "vertical" commerce model whereby it operates at all levels of the market, acting as licensee, licensor, manufacturer, supplier, wholesaler, distributor, and retailer. In December 2020, Fanatics purchased WinCraft, a supplier to Casey's and licensee of MLB Licensed Hardgoods, including, but not limited to, flags, banners, wall art, pennants, decals, and lanyards.[11] At the time of Fanatics's acquisition of WinCraft, it was estimated that WinCraft generated $100 million in annual revenue, employed

---

[8]https://www.cnbc.com/2020/12/07/fanatics-acquisition-licensed-sports-hardgoods-wincraft.html (last visited June 16, 2021.)

[9] https://www.cnbc.com/2021/08/10/fanatics-valued-at-18-billion-with-new-investors-including-jay-z-.html (last visited October 7, 2021).

[10] Fanatics hits $27 billion in new funding, adds BlackRock, Michael Dell (cnbc.com) (last visited June 8, 2022).

[11] https://www.sportspromedia.com/news/fanatics-wincraft-acquisition-hard-goods-non-apparel (last visited June 14, 2021).

over 500 staff, and held client relationships with all of North America's major leagues and teams.[12]

73.    Fanatics's boasts that the success of its v-commerce model has allowed it to enter into partnerships with the "sports world's preeminent leagues, including a groundbreaking deal with Nike and … MLB that kicked off in 2020."[13]  Thus, by definition, Fanatics competes at all levels of the MLB Licensed Product market.

74.    As explained by Steve Davis, President of Fanatics International, "Fanatics has already successfully implemented this 'v-commerce' model across North America, where the company has dramatically scaled up its design, manufacturing and distribution capabilities whilst securing an enviable portfolio of valuable sports licensing rights." [14]

75.    "Sales for Fanatics global e-commerce operation [were] up 30% year over year," and Fanatics expects sales to be over $3 billion in 2021.[15]  Fanatics attributes 82% of its products as direct to consumer, and 90% of that is e-commerce.[16]

---

[12] *Id.*

[13] https://www.fanaticsinc.com/innovation (last visited June 16, 2021).

[14] https://www.sportspromedia.com/analysis/how-fanatics-is-taking-its-v-commerce-model-global (last visited June 15, 2021) (emphasis added).

[15] Jabari Young, *Fanatics Valuation Doubles to $12.8 Billion After a New Funding Round*, CNBC (Mar. 24, 2021, 7:59AM), https://www.cnbc.com/2021/03/24/fanatics-valuation-doubles-to-12point8-billion-after-new-funding-round.html.

[16] Squawk Box, *Fanatics's Michael Rubin on the Company's $6.2 Billion Valuation and Growth Despite Pandemic*, CNBC (Aug. 14, 2020, 7:55AM), https://www.cnbc.com/video/2020/08/14/fanaticss-michael-rubin-on-the-companys-6-point-2-billion-valuation-and-growth-despite-pandemic.html.

### C.    Online Retail Is A Market Separate And Distinct From Brick-And-Mortar Retail

76.    Online retail through TPOMs constitutes a market distinct from brick-and-mortar retail.  As Rubin recognizes, e-commerce is the "most efficient vehicle."[17]

77.    Because of the unique features of online retail through TPOMs, MLB Licensed Products purchased from brick-and-mortar retailers is not an adequate substitute for MLB Licensed Products purchased from online retail through TPOMs.  These unique features include the following, without limitation:

a)    **Convenience**.  Online retail marketplaces give consumers the ability to purchase items and have those items shipped directly to their homes without needing to travel to a physical location; allow consumers to shop at any time rather than only when a physical store happens to be open; and enable consumers to avoid the inconvenience and potential safety hazards associated with crowds.[18]

b)    **Selection**.  Online retail marketplaces give consumers access to a larger volume and variety of inventory.  As Mr. Rubin explains, "[t]he advent of the internet allowed this incredible availability of inventory to serve every fan for whatever team they want, whatever player they want, whatever gender they want, whatever color they want."[19]

c)    **Geographically unlimited**.  Online retail marketplaces make it possible for consumers to purchase MLB Licensed Products from geographically distant Clubs in addition

---

[17] *Fireside Chat with Michael Rubin: Disrupt SF 2018*, Tech Crunch (Sep. 7, 2018, 12:02 PM), https://techcrunch.com/video/fireside-chat-with-michael-rubin-fanatics-disrupt-sf-2018/.

[18] This benefit of online retail has been amplified during the COVID-19 pandemic.

[19] NBC Sports Phila., *Sixers Partner Michael Rubin: Barkann's Big Guest*, Youtube (Dec. 18, 2019), https://www.youtube.com/watch?v=IQRzlcywjO4.

to more local Clubs and Clubs with national followings.  As Mr. Rubin has publicly stated, online retail of licensed sports merchandise (including those of MLB) has been successful in part because "we realized that there were so many fans that lived in different markets from the team that they were a fan of and they couldn't find that merchandise."[20]

        d)    **Data Collection**.  Online retail marketplaces give retailers the ability to collect more and higher quality data regarding consumer behavior in order to more accurately anticipate fans' desires and have the correct product mix available.

        e)    **Virtual Shelf Space**.  Online retail marketplaces allow sellers to offer a greater variety of merchandise without the expense of acquiring and maintaining the additional display space that would otherwise be needed at a physical retail location.

        f)    **Agility**.  Online retail marketplaces help retailers make new products or products for which demand has unexpectedly increased available more quickly than is possible for brick-and-mortar stores.  For instance, if a player makes an impressive play in a nationally televised game, demand for products bearing that player's name often spikes; this demand can be more easily satisfied by retailers that do not have to acquire and display products in a brick-and-mortar store before they can sell them to satisfy the demand.

78.    For these and other reasons, there is an inelasticity of demand between products available for purchase online through TPOMs and those that could be purchased at brick-and-mortar stores.  As a result, prices available at brick-and-mortar stores do not meaningfully constrain the prices charged by online retailers through TPOMs.

---

[20] *The Rich Eisen Show*, YouTube, (Sep. 18, 2019),
https://www.youtube.com/watch?v=mPVPBItYVd4.

79.    Retailers within the online market for MLB Licensed Products look to other online retailers when determining what prices or other features are necessary in order to compete.

80.    Although online retail is typically considered to have lower barriers to entry than brick-and-mortar retail, the barriers are still significant and overlap with those facing brick-and-mortar retailers, including the following, without limitation:

      a)     New retailers' need to acquire MLB Licensed Products to sell from the limited number of licensed manufacturers and their distributors;

      b)     New retailers' need to construct a website and then to advertise through search engines and other means in order to generate traffic;

      c)     Established retailers' ability to take advantage of economies of scale; and

      d)     Consumer preference for retailers with whom the consumers are already familiar.

81.    To lower these barriers to entry, many online retailers use TPOMs rather than more traditional e-commerce platforms.  A more-traditional e-commerce platform is a separate website for a single individual retailer that allows purchases of that retailer's products (e.g., www.dicksportinggoods.com) and is analogous to a brick-and-mortar store that sells one retailer's inventory exclusively (e.g., a Dick's Sporting Goods store).

82.    By contrast, a TPOM is analogous to a farmers' market where a single location hosts multiple independent sellers, who often offer the same or very similar products and compete on the basis of price or quality.  In exchange for providing a platform for sales, a TPOM takes a commission from the third-party retailers' sales (and may charge other fees as well). Familiar TPOMs include the Amazon Marketplace and Walmart.com.

83.     Some websites, such as Amazon.com, include both traditional retail (where Amazon purchases products that it then resells to consumers) and a TPOM (where third parties sell products to consumers using Amazon's platform).

84.     TPOMs offer various advantages to third-party retailers.  They reduce transaction and start-up costs by allowing the seller to piggyback on the brand recognition and traffic of the marketplace site, thereby eliminating the need to design and to drive traffic to a separate e-commerce platform.  This advantage is particularly great for retailers that sell products that are identical or very similar to products sold by many other retailers.

85.     TPOMs also provide centralized payment processing for shoppers and third-party sellers, thereby providing shoppers with a sense of security when providing their financial information online and eliminating the need for third-party sellers to create and maintain a secure portal for internet purchases.  On most TPOMs, a buyer may select items from one or many different sellers but combine all of the items into a single purchase on the TPOM platform.

86.     For an additional fee, some TPOMs such as the Amazon Marketplace allow third-party sellers to store their products at the TPOM's warehouses from which the TPOM will ship the product to the customer.  For a smaller retailer, this benefit further reduces start-up costs and allows the retailer to take advantage of the lower cost of fulfillment services made possible by the TPOM's economies of scale.  Because these features increase access to customers and reduce transaction costs, they are significant, particularly for smaller retailers and the companies that supply them.

87.     In effect, TPOMs reduce the cost of accessing the benefits of e-commerce, thereby making it easier for new retailers to enter the online retail market and smaller retailers to remain in that market.  As discussed herein, Defendants have conspired to protect their share of

the online retail market by excluding competing distributors and retailers from all TPOMs, thereby substantially increasing the cost of participating in the online retail market for MLB Licensed Sports Products.

**D.    Casey's And Others Have Been Excluded From Selling On Amazon's Platform And Other TPOMs**

88.    The trend in this market has been for all participants—licensees and non-licensee distributors and retailers (such as Casey's)—to sell MLB Licensed Products directly to consumers through TPOMs, the most important avenue being Amazon.  TPOM serve as a sole source of income for many retailers who sell MLB Licensed Products to consumers.  Amazon's TPOM is by far the most important platform for small businesses, such as Casey's, as it accounts for more than 40% of e-commerce.

89.    In 2016, MLBP announced it was implementing a Policy for Online Distribution and Marketing of MLBP-Licensed Products ("ODP") restricting MLB Licensed Product sales on TPOMs, such as Amazon, by purportedly requiring licensees to arrange that any retailer on a TPOM first be approved by MLBP.[21]  However, the ODP as written did not prohibit licensees and non-licensees from selling directly to Amazon.  In other words, the ODP as written allowed licensees and non-licensees to sell products directly to Amazon, but it prohibited licensees from selling to distributors or retailers that intended to sell on Amazon without receiving prior authorization to do so from MLB.

90.    Fanatics has been inexplicably excluded from the purported ODP: it is allowed to sell on TPOM without any restriction, such as on Walmart.com and Amazon, in direct violation of the very policies that MLB is trying to enforce.

---

[21] *See* http://www.dugout-memories.com/mlbmemo.html

91.     Casey's initially experienced little to no enforcement of the MLBP's ODP.

Meanwhile, Amazon was in the process of becoming the most important retail outlet for Casey's

to reach consumers of MLB Licensed Products.  Indeed, licensees sold MLB Licensed Products

to Casey's without referencing the ODP.

92.     Casey's and similarly situated companies legitimately bought MLB Licensed

Products from licensees without a mention at the time of the transactions of the ODP or any

limitations on retailing the MLB Licensed Products on TPOMs.  After these legitimate

purchases, Casey's was told they could not sell the products on TPOMs.  Enforcement of this

policy intensified after the mid-2017 MLB equity investment of approximately $50 million into

privately held Fanatics.  The enforcement efforts included pressuring Casey's to remove MLB

Licensed Products from TPOMs or risk having its supply cut off.

93.     Fanatics recognized the problem that robust competition on TPOMs posed to it.  It

is in their role as retailers that Fanatics and the MLB Defendants are in competition with retailers

that sell on TPOMs.  According to Mr. Rubin, if everyone else is selling what you're selling on a

TPOM, "it is going to get commoditized by Amazon and Alibaba."[22]  And as Rubin put it, if

licensed sports products (including those of MLB) "were commonly available at Amazon,

there'd be no reason for [Fanatics] to be."[23]  In another interview, Mr. Rubin put an even finer

---

[22] *Kynetic CEO: Here's How a $12 Billion Company Competes Against Amazon*, CNBC:
Squawk Box (Nov. 27, 2017), https://www.cnbc.com/video/2017/11/27/kynetic-ceo-heres-
how-a-2-billion-company-competes-against-amazon.html.

[23] *Fireside Chat with Michael Rubin: Disrupt SF 2018*, *supra*.

point on it: "If your strategy is just to win on price [selling on a TPOM], you're eventually going to die."[24]

94.     Faced with the challenge of increased competition and recognizing the benefits of collusion, Defendants conspired to allocate the market for MLB Licensed Products on Amazon and TPOMs.  Defendants unlawfully leveraged their market power over other licensees to force those licensees to boycott retailers who sold MLB Licensed Products through TPOMs.

95.     Defendants employed a carrot-and-stick approach to enlist licensees' cooperation. Defendants first threatened licensees with the loss of both their licenses to produce MLB Licensed Products and the loss of Fanatics's business if they did not comply.  Then, as the carrot, Fanatics promised that it would increase its purchases from those licensees who played ball, in order to make up for the now-forbidden sales to smaller retailers.  And, in at least one case, Fanatics outright purchased the business of a large cooperating licensee, WinCraft, and then used that entity to further enforce the scheme.

96.     The licensees responded by collusively enforcing the ODP to exclude non-approved retailers of MLB Licensed Products on TPOMs.  In a non-collusive market, enforcement of the ODP by licensees would be economically disadvantageous.  However, this economic disadvantage was mooted by the understanding that other licensees would also enforce the ODP and therefore these licensee would not have to worry about losing sales.

97.     MLB and the Clubs are transitioning to have Fanatics be their only licensee.  On August 6, 2021, MLB sent a letter to certain of its licensees stating that the MLB was executing an alliance with Fanatics to expand the scale and scope of the MLB's Hardgoods business.

---

[24] Recode, *Full Interview, Adam Silver, NBA Commissioner and Michael Rubin, Exec Chairman of Fanatics*, Youtube (Sep. 13, 2017), https://www.youtube.com/watch?v=TQx65nkEDPI.

Beginning in January 2022, Fanatics would become the MLB's exclusive master licensee for MLB Hardgoods for the U.S. and Canada, with certain exceptions. The MLB directed that licensees should contact Fanatics to explore the opportunity to apply for a pass-through license, and the MLB stated that it would "be working closely with Fanatics[.]" On August 18, 2021, Casey's had a conversation with a high-ranking executive at WinCraft, who stated that WinCraft was going to be the MLB's master licensor starting in 2022, many licenses would not be renewed, and WinCraft would be producing the products.

98.     In line with this expansion of ODP-enforcement efforts following the MLB's investment in Fanatics, Casey's experienced the following:

a.     In 2017, Plaintiff began selling on Walmart.com where sales steadily grew until 2019 when, inexplicably, all or nearly all of Plaintiff's products were removed from the website—action taken around the same time Fanatics announced its partnership with Walmart.com. In January 2019, Fanatics agreed with Walmart.com to be the exclusive seller of MLB products, and all of the other sellers' (including Casey's) products previously listed by sellers were inexplicably removed from Walmart.com.

b.     In a letter dated May 13, 2019, the MLB demanded that WinCraft have distributors and retailers, including Casey's, take down products from TPOMs and that WinCraft monitor confidential data about such transacting by distributors and retailers and report it to the MLB.

c.     On May 16, 2019, a licensee made a telephone call to Casey's and stated that it received a letter from MLB identifying Casey's as a seller of MLB Licensed Products on Amazon.com, demanding that Casey's remove the products.

d.      In a letter dated May 20, 2019, from MLB licensee Duck House to

Casey's, Duck House demanded that Casey's remove MLB Licensed Products from TPOMs

pursuant to the MLBP's policies.

e.      In an email dated June 27, 2019, MLB licensee Team ProMark, LLC's

("ProMark") president told Casey's Kelly Vande Mheen that the MLBP sent ProMark a letter

demanding that it stop selling MLB Licensed Products to Casey's.  ProMark's president stated

that he was "surprised and disappointed" by the MLBP's decision but must have abided by the

demands, despite the president's apparent communications to the MLBP that ProMark had a

long-standing business relationship with Casey's and that Casey's sales were important to TPOM

and to help ProMark meet its minimum guarantee under its MLB license.

f.      During an October 8, 2020, call from Casey's supplier and

wholesaler/licensee, WinCraft, ***WinCraft said that it was acting on Fanatics's behalf*** and

requiring that Casey's remove products from Amazon that Casey's lawfully bought from

WinCraft.  This took place before Fanatics's acquisition of WinCraft.  And at that time,

WinCraft and Fanatics were horizontal competitors.

g.      During a call on January 25, 2021, after Fanatics's acquisition of WinCraft

in December 2020, a high-level representative at WinCraft told Casey's that (i) Fanatics is

forcing WinCraft to impose the TPOM policy, (ii) he knew that TPOMs are the industry's future,

(iii) he knew that enforcing the TPOM policy would drive Casey's out of business, but (iv)

Casey's must reduce its listings on Amazon.  ***According to the high-level representative at***

***WinCraft, Fanatics wanted to dominate the industry at all costs by putting pressure on***

***WinCraft to eliminate Fanatics's horizontal competitors.***  He also sent Casey's a TPOM

compliance tracker of several companies showing how other company's sales of WinCraft

products on TPOMs had been reduced.  This call demarked a significant change in the relationship between Casey's and WinCraft, as Casey's had received WinCraft's "Distributor of the Year" award for two consecutive years prior to this demand.  Indeed, in an email on January 26, 2021, the high-level representative at WinCraft stated the following: "Thanks for your time yesterday and great accomplishments in 2020.  Your company has been a great customer of WinCraft for many years.  We appreciate your business."

h.      In emails during February and March 2021, a second high-level representative at WinCraft demanded that Casey's remove all WinCraft products from Amazon, including those listed by one of Casey's customers.  The high-level representative at WinCraft additionally threatened to withhold shipments if the demand was not met.  These demands were made due to Casey's customers' sales of MLB Licensed Products on TPOMs.  In particular, the high-level representative at WinCraft emailed Casey's Kelly Vande Mheen on March 16, 2021, demanding that Casey's take down from Amazon all products that WinCraft sold to Casey's.

i.      On May 20, 2021, a representative of Casey's reached out to a representative of licensee Logo Brands indicating that Casey's had previously received an email from Logo Brands requesting that Casey's "take all products [including MLB licensed products] off of Amazon because of . . . 'contractual agreements,'" and asking Logo Brands to "shed some light of who these agreements are with."  In response, on May 24, 2021, wholesaler/supplier Logo Brands sent an email to Casey's demanding that Casey's remove products it had listed on Amazon due to a "new" "contractual agreement" ***Logo Brands "just signed with Fanatics*** which prevents 3rd part[ies] from selling Logo Brands products on Amazon."  (Emphasis added.)

j.      On June 3, 2021, Casey's received a demand from supplier and licensee Logo Brands for Casey's to remove all of its listings on Amazon ***due to an "agreement" signed***

***between Logo Brands and Fanatics***.  The agreement that Logo Brands made with Fanatics apparently directed Logo Brands, which also owns Boelter Brands, not to sell products on Amazon or allow any of their customers to sell on Amazon.  A high–ranking official at Logo Brands told Casey's Kelly Vande Mheen that the official had told the owners of Logo Brands a statement to the effect of "***do you realize that we are making a deal with the devil?***"  (Emphasis added.)

       k.     On September 16, 2021, a high-ranking executive at WinCraft emailed Casey's Vande Mheen to ask that products, including MLB products, be taken down from Amazon.com.

       l.     Then, on September 22, 2021, a customer emailed a representative of Casey's, informing the Casey's representative that it had received an email from Logo Brands asking it to stop selling items on Amazon.  Based on this request, this customer asked Casey's "to cancel the PO that I have placed with" Casey's.

       m.     Around September 27, 2021, a Logo Brands high-ranking executive had a call with Casey's Kelly Vande Mheen.  This high-ranking executive said that he gets a call from a vice president at Fanatics, which competes horizontally with Logo Brands as a licensee, once every few weeks.  The Fanatics vice president advised the Logo Brands high-ranking executive about which companies were selling on Amazon.com, which was against the agreement that Fanatics made with Logo Brands; according to the Logo Brands' high-ranking executive, no one was allowed to sell on or even to Amazon.com.  The Logo Brands high-ranking executive stated that under Logo Brands' agreement with Fanatics, which are both horizontally competing licensees, Casey's would not have been able to sell its products on or even to Amazon.com—it is noteworthy that even under the ODP language, Casey's would have been permitted to sell

products to Amazon.com.  Casey's Kelly Vande Mheen asked the Logo Brands high-ranking executive about the legality of the agreement between Logo Brands and Fanatics.  In essence, the Logo Brands high-ranking executive stated that the agreement was known to have been problematic but that people realized how much wealth Fanatics and Mr. Rubin had, and thus nobody wanted to contest them.

n.    On September 29, 2021, as described in an email to Casey's Kelly Vande Mheen, this same customer spoke to a representative of Logo Brands and confirmed that Logo Brands has an exclusive deal with an Amazon approved seller and that Logo Brands requested that this Casey's customer "stock-down on" items then listed on Amazon's TPOM.

o.    Starting on November 5, 2021, a high-ranking executive at WinCraft emailed Casey's Kelly Vande Mheen, showing data that WinCraft has been monitoring about the listings on Amazon.com by Casey's client, and demanding that Mr. Vande Mheen force the client to take down the products from Amazon.com.  Mr. Vande Mheen emailed a response that day, noting that Casey's reaching out to its client would put a strain on Casey's business relationship with the client.  And Mr. Vande Mheen asked WinCraft's high-ranking executive if WinCraft could forward a written policy that supported WinCraft's demand.  On November 7, 2021, WinCraft's high-ranking executive responded to Mr. Vande Mheen's email, stating the following, in part: "I understand the challenge and will always provide support within our policies.  At this time I don't have a specific document to [send the company] I am sure you understand why 3rd party selling would be important."  Throughout the rest of November 2021, the WinCraft high-ranking executive has been continuing to reach out to Casey's to demand reporting and compliance.

p.      On November 16, 2021, Casey's Kelly Vande Mheen had a conversation with a sales manager of an MLB licensee.  The sales manager said that there was a meeting with the MLB that week.  The MLB licensee's license was due to expire by the end of 2021.  In the new agreement, the MLB would only allow the licensee to sell MLB Licensed Products to Fanatics and the MLB teams.  The MLB licensee would no longer be allowed to sell MLB Licensed Products to any other accounts.  The sales manager of the MLB licensee said that there was knowledge of two other licensees that were extended the same offer.

q.      On December 13, 2021, a high-ranking executive from Pro Specialties Group Inc. ("PSG") emailed Casey's to state that starting January 31, 2022, it would stop selling MLB Licensed Products to Casey's because PSG had agreed with Fanatics (a horizontally competing licensee) to only sell MLB Licensed Products to Fanatics and the MLB teams (horizontally competing retailers).

r.      On December 16, 2021, Casey's Kelly Vande Mheen had a conversation with the owner of Sporticulture, an MLB licensee, who stated that it had an agreement with Fanatics that prohibited Sporticulture from selling any MLB Licensed Products to Amazon.com.

s.      On December 27, 2021, Casey's Kelly Vande Mheen spoke with an executive at The Northwest Co. ("Northwest"), which holds an MLB license.  The Northwest executive said that Fanatics dropped all of Northwest's products from websites that Fanatics controls because Northwest refused to sign an exclusive agreement with Fanatics.

t.      Also on December 27, 2021, Casey's Kelly Vande Mheen received an email from a representative from Aminco International (USA), Inc. ("Aminco"), which is an MLB licensee, attaching a letter from Aminco and stating in the email that "[t]his situation is not the best for both of us[.]"  It was stated in Aminco's letter that the MLBP in August 2021

announced that starting in January 2022, Fanatics will become the exclusive master licensee for

MLB Hardgoods for U.S. and Canada, with certain exceptions.  According to the letter, Aminco

was notified in mid-November 2021 that it would not be licensed to sell MLB products to any

customers other than Fanatics and the MLB teams.  It appeared that WinCraft would be the only

licensee in this category.  Aminco stated that it "***has been a licensee for over 25 years and a***

***proven performer, but the decision was made to eliminate competition in this category***."

(Emphasis added).  Another source has corroborated Aminco's lost license under these

circumstances.

       u.     On March 9, 2022, an owner of a licensee, which has an agreement with

Fanatics, had a phone call with Casey's Kelly Vande Mheen and told him that Licensed Products

could not show up on Amazon because if so, there would be very strong repercussions against

his company.

       99.     In addition to the allegations above concerning correspondence demonstrating

collusion here among horizontal competitors in the licensee and online retail segments, Casey's

saw a written agreement that appears to be between Fanatics and its horizontally competing

licensees and retailers to group boycott entities, such as Casey's, from competing with Fanatics

and its colluding licensees and retailers in selling products on or to Amazon.  And licensees

during phone calls to Casey's had stated that in enforcing the purported MLB policies, licensees

were acting at the direction of their horizontally competing licensee and retailer, Fanatics.

       100.    Defendants established and operated a mechanism to police and enforce the

conspiracy through compliance trackers of the number of products and sellers who had been

removed and/or boycotted from selling MLB Licensed Products on TPOMs.  Those trackers

were shared among Defendants in an effort to enforce the conspiracy with maximum efficiency.

Fanatics is the key driver and enforcer of the conspiracy, using high-pressure, strong-arm tactics to encourage licensees to help eliminate Fanatics's competitors from TPOMs. Fanatics and its agents created reports that it sent to licensees showing the names of sellers and products offered for sale on TPOMs and threatened the licensees with consequences if the reports did not show progress in lowering the number of competing retailers and products offerings.

101. Casey's own sales data demonstrate the importance of selling through TPOMs and show the damaging impact of the enforcement of the TPOM Policy. For example, Casey's Amazon TPOM sales of MLB Licensed Products continued to increase almost six fold from 2016 to 2020. However, the subsequent step-up in the enforcement of the TPOM Policy by MLB and Fanatics caused Casey's Amazon TPOM sales of MLB Licensed Products to suddenly plummet by 30% from its 2020 sales. As a result of the TPOM Policy, Defendants have effectively commandeered the e-commerce market for MLB Licensed Products, while e-commerce retailers such as Casey's are excluded from their previously held positions as competitors in the MLB Licensed Products market on TPOMs.

102. On December 14, 2021, a high-ranking executive at WinCraft sent Casey's Distributing a detailed tracker of Casey's transacting data in league-licensed products, including, without limitation, those from the MLB and NFL. Casey's purchases from WinCraft for all leagues was down 33% year-to-date at that time from the prior year. They also projected a further erosion in 2022.

**E.    The MLBP's Policy Prohibiting Retailers From Selling MLB Licensed Products On TPOMs Violates The Antitrust Laws And Harms Competition**

103. Through its ODP, the MLBP restricts which entities are permitted to sell on TPOMs, thus reducing the number of entities on TPOMs that compete in the market for retail sales of MLB Licensed Products. It is important to emphasize that the ODP is designed to allow

the MLBP to reach downwards to attempt to restrict the conduct of retailers – including those that lack privity with the MLBP.

104.    In other words, the MLBP leveraged its license-renewal and other powers over its licensees in order to have its licensees effect control over those retailers to which its licensees sell and with which the MLBP has no direct contractual relationship.  Through this power to reach downwards via its licensees to control those with which it has no direct relationship, the MLBP regulated and restricted who can sell MLB Licensed Products on TPOMs.

105.    Now that all license renewals are through Fanatics, which is protecting its own interests, Fanatics, at least in certain cases, in exchange for the license renewal is requiring the licensees (that horizontally compete with Fanatics as a licensee) to sell only to Fanatics, thereby restricting and in some cases eliminating the supply of certain types of MLB Licensed Products that compete with certain of Fanatics products.

106.    The ODP obligates the MLBP's licensees to restrict the conduct of downstream retailers with which the MLBP lacks privity: "Licensees may not, directly or indirectly, sell any consumer products licensed by MLB Advanced Media, L.P. ("MLB") (as agent for BOC, Major League Baseball Properties, Inc. and the Clubs pursuant to the Major League Baseball Agency Agreement) ("MLB Licensed Products") to retailers for online sales, except to websites owned by those retailers identified below ("Approved Online Retailers") or retailers otherwise approved in writing by MLB's Senior Vice President of Consumer Products."  Under an implied threat of non-renewal and other powers over licensees, the MLBP uses the ODP to have its licensees regulate and restrict the conduct of downstream retailers on the MLBP's behalf.

107.    The ODP further requires that "Retailers" may not do the following, unless otherwise approved in writing by MLB:

a.    Except as set forth in the next sentence, use any MLB-owned or controlled names, logos or other trademarks (collectively, "MLB Trademarks") on their websites. Provided they otherwise comply with MLB's policies and applicable law, retailers may show MLB Licensed Products they offer for sale;

b.    Use photographs or footage from MLB games or events on or in connection with their websites;

c.    Purchase, bid or participate in auctions on any Internet search engines (including, but not limited to, Alibaba, Amazon, Bing, eBay, Facebook, Google, Twitter or Yahoo!) for any terms or variations of terms that include any MLB Trademarks or any terms that refer to MLB Licensed Products; or

d.    Display advertisements, including, but not limited to, product listing advertisements or Third Party Marketplace advertisements (as defined below) using MLB Trademarks, any terms that refer to MLB Licensed Products or otherwise relating to MLB or the MLB Clubs.

Under "Restrictions on Retailer's Sales" the ODP also requires:

Retailers who sell MLB Licensed Products online are not authorized to sell such products under any Third Party Marketplaces, Internet buying sites (e.g., buy. Com or ebay.com) or Internet aggregation sites (e.g., Yahoo! or aol.com). Licensees shall ensure that any retailer to whom they sell MLB Licensed Products sells such products online (i) in accordance with MLB's policies, and (ii) only via websites that are not marketed under any third party's brand and that are owned or controlled by such retailer.

***

For purposes of this policy, "Third Party Marketplaces" include third party storefronts and other sites that allow multiple third party sellers to sell merchandise directly to the public and for which the shopping cart and checkout process occurs directly on such site (e.g., Alibaba, Amazon Marketplace, eBay, Rakuten, Sears Marketplace and Walmart Marketplace).

With respect to ODP enforcement, the MLBP requires:

Licensees who are notified by MLB that retailers are selling MLB Licensed Products in a manner prohibited by this policy shall cease shipments of such products to those retailers within five (5) days of receiving MLB's notice, unless otherwise directed in writing by MLB.

34

Specifying its power over Licensees, the ODP further indicates that:

> MLBP reserves the right to amend this policy in its sole discretion without prior notice in any manner and at any time.

108.    Further limiting an e-commerce retailer's ability to compete, the MLBP places restrictions on entities looking to sell MLB Licensed Products by preventing them from using any trademarks associated with the MLB or its member teams in connection with paid search on Internet search engines (e.g., Google, Yahoo!) or other forms of targeted advertising.

109.    In addition, Defendant Fanatics engaged in anticompetitive conduct by entering into separate agreements with WinCraft (before it was acquired by Fanatics) and with Logo Brands, among others, which interfered with, restricted, or hindered the ability of TPOM retailers like one of Casey's customers to obtain supply.

110.    Fanatics's ability to strangle the competition in online retailing of MLB Licensed Products is further demonstrated by written agreements that it has in place with horizontally competing licensees and other types of companies that like Fanatics, either supply or retail products online.  For example, Casey's is aware of a written agreement that appears to be between Fanatics and its horizontally competing licensees to group boycott entities, such as Casey's, from competing with Fanatics and its colluding licensees in selling products on or to Amazon.

111.    Another example is a written minimum-advertised-prices policy ("MAP Policy") that appears to be enforced by Fanatics against its horizontal competitors, whether they be licensees that horizontally compete with Fanatics or retailers that horizontally compete with Fanatics, that in essence forbids them from advertising lower prices than Fanatics—virtually all types of advertising in any forum, whether it be print, outdoor billboards/signage, broadcast, direct (paper) advertising, email and web advertising, internet advertising, or any type of web

advertising.  This MAP Policy is not a suggestion: it has byzantine punishments for violators, such as suspension from purchasing Fanatics products indefinitely.  It is not tethered to receiving advertising funds from Fanatics; no advertising budget provided by Fanatics is referenced in the MAP Policy.

112.    By reducing the number of competing entities on TPOMs, prices for MLB Licensed Products are artificially increased.  In addition, product quality, service quality, and product selection are diminished, all reducing the quality of the customer experience.

113.    MLB's restriction on selling on TPOMs does not impact Fanatics.  Rather, Fanatics's market power is greatly expanded by allowing it to increase its already dominant role in the market for MLB Licensed Products sold online—market power that Fanatics previously held by "powering" the MLB's various websites, including the websites for most of the MLB's 30 Clubs, in addition to its own website (Fanatics.com).  Fanatics thus is striving to become the exclusive seller of MLB Licensed Products on TPOMs, to the detriment of former competitors such as Casey's that once sold a substantial amount of MLB Licensed Products on TPOMs prior to being foreclosed from doing so by the MLBP, and consumers.

114.    The anticompetitive conduct described herein has caused or is likely to cause consumers to pay higher prices for MLB Licensed Products and interference with the particular MLB Licensed Products that Plaintiff and others are able to sell.  Further, this anticompetitive conduct discourages new entrants into the market.

115.    If competing retailers are hindered, restricted, or prohibited from selling MLB Licensed Products on TPOMs, end-user customers will likely use the MLB's Amazon TPOM "storefront" or otherwise buy from the MLB, its Clubs, or Fanatics's other online retail Internet

properties, where the MLB and Fanatics can charge more for the products and generate even greater profits.

### F.    No Procompetitive Justifications Excuse Defendants' Collusive Conduct

116.    Because Defendants' collusion to impose a horizontal boycott of retailers competing with Fanatics and the MLB Defendants is *per se* illegal, any procompetitive justifications for their conduct are irrelevant.

117.    Nevertheless, there are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint or for any individual aspect of Defendants' conspiracy.  But even if there were, there are substantially less restrictive means of achieving those purported procompetitive effects.  To the extent that Defendants' conduct has any cognizable procompetitive effects, they are far outweighed by the harm to competition and consumer welfare described in this Complaint.

118.    Evidence of diminishing product quality and poor customer service directly attributable to Fanatics is abundant.  For example, the Better Business Bureau lists 489 complaints in the past three years for "Fanatics Retail Group" with an average Customer Review Rating of 3.27/5 stars[25]; and 269 complaints in the past three years for "Fanatics, Inc." with an average Customer Review Rating of 1.2/5 stars.[26]  Common complaints include problems with customer service, shipping delays, and product defects.[27]  Improved competition in the market would naturally diminish the frequency of such complaints because competing market

---

[25] https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-retail-group-0403-29000877/complaints (last visited June 22, 2021).

[26] https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-inc-0403-235965780/customer-reviews (last visited June 22, 2021).

[27] *Id*.

participants would compete to improve product quality, service quality, and customer satisfaction.

119.    The MLBP's purported objectives are nothing more than pretext, could be accomplished by substantially less restrictive means, and in fact likely will not be accomplished by restricting entities such as Casey's from selling on TPOMs.  For example, Amazon's Founder and CEO Jeff Bezos testified before the House Judiciary Committee that third-party sellers on Amazon's platform increase product selection and improve customer satisfaction:

> But we committed to the idea that over the long term [allowing third-party sales] would increase selection for customers, and that more satisfied customers would be great for both third-party sellers and for Amazon.  And that's what happened. Within a year of adding those sellers, third-party sales accounted for 5% of unit sales, and it quickly became clear that customers loved the convenience of being able to shop for the best products and to see prices from different sellers all in the same store.  These small and medium-sized third-party businesses now add significantly more product selection to Amazon's stores than Amazon's own retail operation.[28]

In Bezos' words, and in contradiction of the MLBP's TPOM Policy, after the introduction of third-party sellers "the whole pie did grow, third-party sellers did very well and are growing fast, and that has been great for customers and for Amazon.[29]

120.    In addition, the MLBP's TPOM Policy does not reduce the presence of counterfeit goods in a manner that is narrowly tailored to accomplish that goal.  Rather than reducing the presence of counterfeit goods, Defendants' concerted action is targeted not at pirates, but, by definition, at those entities who are reselling officially licensed products sold by approved licensees.  For example, Casey's does not sell counterfeit goods, has never been accused of selling counterfeit goods, and has no intention of selling counterfeit goods in the

---

[28] https://www.congress.gov/116/meeting/house/110883/witnesses/HHRG-116-JU05-Wstate-BezosJ-20200729.pdf (last visited October 7, 2021).

[29] *Id.*

future.  The MLBP decides who receives a license in the first instance; subsequent transactions on TPOMs do not invalidate the license.  Yet, Casey's and the class are prohibited from selling MLB Licensed Products on TPOMs.  If the goal is to prevent the sale of counterfeit MLB Products, the MLBP's TPOM policy is overbroad.

## V.     THE RELEVANT ANTITRUST MARKET AND MARKET POWER

121.    The relevant product market is the TPOM retail market (including, without limitation, direct sales to Amazon for resale) for Products bearing the Intellectual Property of the MLB or any MLB Club (also referred to herein as MLB Licensed Products).  The relevant geographic market is the United States of America.  This relevant product market and relevant geographic market is collectively referred to herein as the "Relevant Antitrust Market".

122.    Through the alleged anticompetitive conduct herein, Plaintiff Casey's and the Class members have been (and are continuing to be) boycotted and otherwise collusively removed from retailing MLB Licensed Products—that they legitimately acquired—through TPOMs to consumers.  The Relevant Antitrust Market is limited to MLB Licensed Products because Plaintiff Casey's and the Class members are being unlawfully foreclosed from retailing to consumers who are purchasing products with an MLB or Club's logo for the ability to be identified with the MLB or the Club—the right to be recognized as a fan.  These consumers who would be purchasers from Plaintiff Casey's and the Class members have fan loyalty and do not deem licensed products from other athletic leagues or other types of licensed products to be reasonable substitutes.  There is neither reasonable interchangeability nor cross-elasticity of demand for non-MLB Licensed Products or other types of licensed products.

123.    MLB Licensed Products are distinct from products that do not bear MLB or Club logos.  Consumers purchase MLB Licensed Products not because they value the object bearing

the logo itself; rather, these consumers want to use a product that displays their loyalty to the

MLB or Club.  Indeed, Fanatics itself acknowledges this important purchasing dynamic[30], and

industry participants track economic and financial statistics about the market for MLB-licensed

products separate and apart from those tracked for other league licensed or unlicensed products.

The MLB and its Clubs have a fan base that is distinct from those of other athletics leagues.

Other athletics leagues generally play a different sport, a different level or caliber of the same

sport, at different times of the year, in different cities (and some in the same cities), and at

different venues.  Similar products bearing other league logos are not reasonable substitutes.

124.    The market for MLB Licensed Products is distinct from that for licensed products

representing other fandoms.  For example, although a consumer may be a fan of both the New

York Yankees and a comic book hero, this consumer would still not consider a T-shirt bearing

the comic book hero's logo as a reasonable substitute for one bearing a New York Yankees logo.

And although that same consumer may also be a fan of the New York Jets (a team within a

different athletic league), this consumer would still not consider a T-shirt bearing the New York

Jets's logo to be a reasonable substitute for the one bearing the comic book hero's logo nor the

one bearing the New York Yankee's logo.  The licensed products would be used to express

different loyalties and potentially at different times and places to elicit satisfaction and approving

reactions from different sorts of people.

125.    The Relevant Antitrust Market is limited to new products.  The market for new

MLB Licensed Products is distinct from the market for vintage MLB Licensed Products.

Vintage MLB Licensed Products are sold by different types of sellers through different outlets.

---

[30] *See Why Shop With Us?*, Fanatics, https://www.fanatics.com/why-shop-with-us/ch-2389 (last visited Aug. 17, 2021).

For instance, vintage sports memorabilia, particularly if it is valuable or rare, is often sold

through auctions or private sales rather than through retail outlets.  Even sellers that sell both

new and vintage MLB Licensed Products will tend to display them separately in both brick-and-

mortar or online stores rather than mixing the two types of products together.  The pricing

structure also tends to differ; prices for products associated with current athletes on a team tend

not to vary substantially with the identity of the athlete, while the price of vintage products

heavily depends on the rarity and age of the product, as well as on the popularity of the player

appearing on the product (e.g., a Babe Ruth signed baseball would typically sell for much more

than a baseball signed by a lesser-known player).  Consumers also treat the two types of products

quite differently, indicating that they are not exchangeable for one another.

### A.    MLBP's Monopoly Or Market Power

126.    According to the "Major League Baseball Properties, Inc. License Agreement,"

MLBP serves as agent for the Major League Baseball Clubs" for the licensing of their

logos . . . ."[31]  Thus, the MLBP is the entity responsible for licensing the MLB and the Clubs'

intellectual property.

127.    As alleged herein, MLBP controls the merchandising and licensing of MLB

Licensed Products.  It is not legally possible for licensees to sell MLB Licensed Products without

first obtaining a license to use the Intellectual Property from the MLBP or without first obtaining

a license to use the Intellectual Property from any of the MLB's Clubs.  The MLBP has

monopoly or market power over the upstream United States market for the licensing of the

---

[31] *See*
https://ipmall.law.unh.edu/sites/default/files/hosted_resources/SportsEntLaw_Institute/Agent%2
0Contracts%20Between%20Players%20&%20Their%20Agents/Major%20League%20Baseball
%20Properties,%20Inc._License%20Agreement.pdf.

MLB's and the Clubs' Intellectual Property, including licensing fees and minimum guarantees. For that reason, the MLBP maintains all or substantially all control over how MLB Licensed Products reach consumers and has market power as a result.[32]

128.    MLBP's monopoly power in the Relevant Antitrust Market is also demonstrated by its ability to control the entities that may sell MLB Licensed Products, as shown by the agreements and policies that are challenged in this case.  By controlling who may sell MLB Licensed Products, the MLBP's control of MLB trademarks poses a barrier to entry to competition.  As discussed above, MLBP's control extends to regulating the conduct of its licensees, including by requiring them to monitor downstream product purchases and restricting downstream sales on Amazon's TPOM and other TPOMs.

**B.**    **Amazon's Monopoly Or Market Power**

129.    The monopoly power of Amazon over the third-party marketplace was recently recognized by Congress in a House Judiciary Committee Staff Report and Recommendations ("Judiciary Report"), which concluded that Amazon has significant and durable power in the U.S. online retail market, with up to 50% of all online sales being controlled by Amazon.[33]  The report also concluded that as the dominant marketplace in the United States for online shopping,

---

[32] As Defendant MLBP is a privately held entity and has not released to the public market share-related information in any materially significant or meaningfully helpful way, Defendant MLBP's market share information is not known with specificity to Plaintiff at this time. However, discovery will likely shed light as to both Defendant MLBP's and Defendant Fanatics's respective market shares, as well as how Defendant MLBP's market share impacts others.

[33] Staff of S. Comm. On Antitrust, Commercial, and Admin. Law of the Comm. On the Judiciary, 116th Cong., Rep. on Investigation of Comp. in Digital Markets, p. 15.

Amazon's market power is at its height in its dealings with third-party sellers.[34]  According to

the Judiciary Report:

> The [Amazon] platform has monopoly power over many small- and medium-sized businesses that do not have a viable alternative to Amazon for reaching online consumers.  Amazon has 2.3 million active third-party sellers on its marketplace worldwide, and a recent survey estimates that about 37% of them—about 850,000 sellers—rely on Amazon as their sole source of income.[35]

The Judiciary Report also noted that "[a]s a result of Amazon's dominance, other businesses are

frequently beholden to Amazon for their success."[36]

130.    Moreover, the Judiciary Report explained that:

> Amazon has engaged in extensive anticompetitive conduct in its treatment of third-party sellers.  Publicly, Amazon describes third-party sellers as "partners." But internal documents show that, behind closed doors, the company refers to them as "internal competitors."  Amazon's dual role as an operator of its marketplace that hosts third-party sellers, and a seller in that same marketplace, creates an inherent conflict of interest.[37]

131.    In part, the MLB's decision to enter into agreements and policies that benefit and

protect Fanatics, confirms Amazon's power over retail sales to end-user consumers.  Rather than

battling with its dominant e-commerce rival, Amazon, Fanatics benefitted from Amazon's

conduct.

**C.**    **Fanatics's Monopoly Or Market Power**

132.    As Fanatics's size and power has grown, so has its market share and, in particular,

its market share of MLB Licensed Products sold through online channels.  A conservative

---

[34] *Id*.

[35] *Id*.

[36] *Id*.

[37] *Id*.

estimate would attribute substantial market power to Fanatics for e-commerce sales of MLB

licensed products.[38]

133.    Fanatics's market power has been recognized by industry observers.  For

example, it has become a trope to call Fanatics the "Amazon of sports apparel," analogizing

Fanatics's dominance of the market for licensed sports products to Amazon's dominance of

online retail.[39]

134.    By the fall of 2017, Fanatics was recognized as "one of the world's largest

licensed sports merchandise retailers" and that, with respect to its aspirations outside of the U.S,

it hopes to "implement[] a strategy to replicate its *home market dominance* and capabilities in

licensed sports merchandise . . . ."[40]

135.    After it raised approximately $350 million in August 2020, Fanatics purchased

"hard good manufacturer" WinCraft in December 2020.[41]  WinCraft, a manufacturer, supplier,

and retailer of MLB Licensed Hardgoods, including, but not limited to, flags, banners, wall art,

pennants, decals, and lanyards, generates $100 million in annual revenue, employs over 500

---

[38] As Defendant Fanatics is a privately held entity and has not released to the public market share-related information in any materially significant or meaningfully helpful way, Defendant Fanatics's market share information is not known with specificity to Plaintiff at this time. However, discovery will likely shed light as to both Defendant MLBP's and Defendant Fanatics's respective market shares, as well as how Defendant Fanatics's market share impacts others.

[39] *See, e.g.*, Jon Wertheim, *Fulfilling Fanatic*, Sports Illustrated (Jan. 5, 2021), https://www.si.com/nba/2021/01/05/michael-rubin-fanatics-nba-owner; Kendall Baker, *Fanatics Is Dominating the Sports Apparel Market*, Axios (May 20, 2019), https://www.axios.com/fanatics-sports-apparel-retail-a924fe76-5f9a-4b49-9db3-88d0c6897958.html ("Fanatics is to sports apparel what Amazon is to, well, everything else.").

[40] *See* https://www.sportspromedia.com/analysis/how-fanatics-is-taking-its-v-commerce-model-global (last visited June 15, 2021) (emphasis added).

[41] *See* https://www.sportspromedia.com/news/fanatics-wincraft-acquisition-hard-goods-non-apparel (last visited June 14, 2021).

staff, and has client relationships with all of North America's major leagues and teams.[42]  Gene

Goldberg, a former NFL licensing executive, described WinCraft as "the biggest fish" as

WinCraft "has nearly every major license across sports" and its "product line of novelties

includes pennants, bumper stickers, koozies, towels, magnets, banners and signs."[43]  WinCraft

now operates under the "Fanatics Brands division."[44]

136.    In addition to helping Fanatics dominate the Hardgoods side of the MLB Licensed

Products business, Fanatics's purchase of WinCraft was apparently also part of the Defendant's

"focus[] on accelerating its vertical commerce business and strengthening its manufacturing and

distribution businesses."[45]

137.    Importantly, as discussed above, in January 2019, MLB granted Fanatics the

exclusive rights to design, manufacture, and distribute all Nike MLB fan gear, with Nike

retaining the exclusive right to supply MLB player uniforms, baselayers, training apparel, and

footwear to the teams on-field.  Fanatics has monopoly power for all licensed apparel.

138.    Additionally, beginning in January of 2022, Fanatics became the exclusive master

licensee for MLB Hard Goods for the United States and Canada.  This allows Fanatics to choose

its competitors in MLB Hard Goods, and therefore it has monopoly power in MLB licensed

Hardgoods.

139.    Fanatics's market share is sufficient by itself to infer market power in the

Relevant Antitrust Market.  And when combined with the MLB Defendants' additional market

---

[42] *See id.*

[43] *See* https://www.bizjournals.com/twincities/news/2020/12/07/sportswear-maker-fanatics-acquiring-wincraft.html (last visited June 14, 2021).

[44] *See* https://www.postbulletin.com/business/manufacturing/6796519-Winonas-WinCraft-sold-to-Florida-based-fanatics (last visited June 14, 2021).

[45] *See id.*

share, it is reasonable to infer that Defendants control the vast majority of the Relevant Antitrust Market for MLB Licensed Products.

140.    Defendants' market power gives them the ability to exclude competitors. Defendants, especially Fanatics, demonstrated their actual market power by prohibiting licensees from selling to retailers and boycotting retailers from operating on TPOMs and thus competing with Defendants' own retail operations.  This power is especially noticeable because Defendants used it to restrain not only licensees' future sales but also the ultimate retail sale of MLB Licensed Products that licensees had already sold to distributors and retailers without these restrictions.  Defendants stunted the growth and effectuated the removal of scores of retailers' MLB Licensed Products from TPOMs, including Amazon and Walmart.

141.    Fanatics now likely has or is substantially close to having a monopoly share of the market for sales of MLB Licensed Products conducted online.  In addition to its own online retail website Fanatics.com, Fanatics currently operates the e-commerce websites of a majority of the major professional sports leagues, including the MLB and all of the MLB Clubs.  However, even if Fanatics cannot be said to have general monopoly power in the MLB Licensed Products market, around January 2022, the MLB demanded that if a licensee of an MLB Intellectual Property License wants to renew, it must do so directly through, with the permission of, and under the conditions of Fanatics, ***which is a horizontal competitor of the licensee of the MLB Intellectual Property License***, which gives Fanatics actual or near monopoly power over e-commerce sales of MLB Licensed Products conducted on TPOMs.  Moreover, Fanatics has been forcing and getting horizontally competing licensees and retailers to agree to only sell MLB Licensed Products to Fanatics for selling on TPOMs.  These alleged anticompetitive agreements,

coupled with the MLB funneling all licensees through Fanatics, cements Fanatics's actual market power—if not actual monopoly power—over the sale of MLB Licensed Products on TPOMs.

## VI.    DEFENDANTS WILLFULLY AND IMPROPERLY ACQUIRED OR MAINTAINED THEIR MONOPOLY POWER THROUGH ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT

### A.    MLBP

142.    MLBP engaged in various conduct designed to lessen competition, increase prices, reduce availability, reduce output, and unfairly advantage and aggrandize itself with respect to e-commerce sales of MLB Licensed Products on TPOMs, separate and apart from having a superior product, business acumen, or historic accident.

143.    The monopoly power of MLBP (as extended into the downstream market for e-commerce sales of MLB Licensed Products on TPOMs) was willfully acquired or maintained through the following:

- Its decision to not renew at least one MLB Intellectual Property License so as to eliminate competitors of Fanatics in the MLB Licensed Products market, in violation of 15 U.S.C. § 2;

- As discussed above, in January 2019, MLB granted Fanatics the exclusive rights to design, manufacture, and distribute all Nike MLB fan gear, with Nike retaining the exclusive right to supply MLB player uniforms, baselayers, training apparel, and footwear to the teams on-field; and

- Around January 2022, MLB demanded that if a licensee of an MLB Intellectual Property License wants to renew, it must do so directly through, with the permission of, and under the conditions of Fanatics, *which is a horizontal competitor of the licensee of the MLB Intellectual Property License*.

47

144.    MLBP's intent to acquire and maintain monopoly power through anticompetitive and exclusionary conduct is further established through its efforts to create and then selectively enforce its TPOM Policy.  The TPOM Policy was designed to and prevented Plaintiff and other non-licensees from selling MLB Licensed Products on TPOMs.  In addition to an implicit threat of non-renewal, the MLBP also required its licensees to prevent Casey's and others from selling on TPOMs, by threatening licensees with its power to prohibit licensees from selling MLB Licensed Products to "any retailer" if the MLB believes that such sales would be detrimental to the "MLB's brand image."

### B.    Fanatics

145.    Fanatics has also engaged in a variety of conduct designed to lessen competition, increases prices, reduce availability, reduce output, and unfairly advantage and aggrandize itself with respect to e-commerce sales of MLB Licensed Products on TPOMs, separate and apart from having a superior product, business acumen, or historic accident.

146.    The monopoly power of Fanatics over e-commerce sales of MLB Licensed Products on TPOMs was willfully acquired or maintained, but not through any legitimate pricing, quality, supply chain, technological, or other types of advantages or consumer demand, in violation of 15 U.S.C. § 2.

147.    For example, Fanatics acquired and maintained its monopoly or market power over e-commerce sales of MLB Licensed Products on TPOMs through anticompetitive, monopolistic, and exclusionary means, including, but not limited to, the following examples:

- By selling a pre-public equity stake in itself to the MLB, for which the MLBP acts as an agent with respect to the League's Intellectual Property concerns[46];

- By enforcing the terms of the TPOM Policy to pressure MLB Intellectual Property licensees to stop selling to companies like Casey's seeking to sell MLB Licensed Products on TPOMs;

- By pressuring its own Hardgoods division (WinCraft) to communicate with representatives of Casey's that Casey's supply of WinCraft-based MLB Licensed Hardgoods could be threatened if Casey's did not stop selling such products on Amazon's TPOM;

- By acquiring the exclusive rights to design, manufacture, and distribute all Nike MLB fan gear, with Nike retaining the exclusive right to supply MLB player uniforms, baselayers, training apparel, and footwear to the teams on-field.  Fanatics has monopoly power for all licensed apparel; and

- By acquiring the exclusive master license for MLB Hard Goods for the United States and Canada.

148.    Fanatics exploited for its own benefit the TPOM-related restrictions faced by its competitors for retail sales of MLB Licensed Products on TPOMs.

149.    This included Fanatics entering into written agreements with licensees, containing provisions apparently similar to that of the ODP, which enabled Fanatics to use such licensees to

---

[46] Fanatics thus benefits from the circumstance of having an equity holder, MLB, in charge of its agent, MLBP, from which Fanatics has received one or more MLB Intellectual Property licenses.

discourage or prevent their respective non-Fanatics customers from retailing MLB Licensed Products on TPOMs.

150.    Despite the MLBP's TPOM Policy, Fanatics was permitted to sell *its* products on Amazon and other TPOMs.

## VII.    PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF

151.    Plaintiff Casey's requests that this Court award injunctive relief prohibiting MLBP and Fanatics from enforcing the MLBP's TPOM Policy or other anticompetitive policies in collusive fashion, which hinders, interferes with, limits, and/or prevents Casey's and others similarly situated from selling MLB Licensed Products on TPOMs without first obtaining written permission from MLBP.

152.    Plaintiff Casey's requests on behalf of itself and all others similarly situated that MLBP and Fanatics cease, stop, abandon, and otherwise desist from enforcing the MLBP's TPOM Policy or other anticompetitive policies in collusive fashion.  Thus, the requested relief here is directed to ending Defendants' hindering, limiting, preventing, or prohibiting Casey's and others similarly situated from selling MLB Licensed Products on TPOMs in collusive fashion.

153.    The MLBP, through its TPOM Policy, also seeks to limit the numbers of those who are permitted to sell on TPOMs and to limit those who can sell to others seeking to retail MLB Licensed Products on TPOMs.

154.    MLBP and Fanatics have caused Plaintiff and the other Class Members (as defined below) irreparable harm, which cannot be remedied completely by financial compensation to Casey's and other similarly situated Class Members.  Because the efforts by MLBP and Fanatics have denied Plaintiff Casey's and others the ability to run a particular type of business, one that benefits from the features, services, technologies, and widespread consumer

access associated with selling on TPOMs, legal remedies are inadequate, and the requested

equitable relief is justified.  For example, businesses operating on Amazon's TPOM benefit from

Amazon's consumer and transaction focused tools, which include credit card processing, product

fulfillment, product return, anti-theft and other security, efficiency enhancement, and order and

inventory tracking features, services, and technologies.  In addition, in many circumstances,

Amazon's order and inventory tracking technologies communicate and integrate with that used

internally by small businesses (referred to by Casey's as "synchronized flow technology"),

which help facilitate orders and prevent small businesses from offering for sale product for

which they lack inventory.  Because customer service requirements and demands are

comparatively greater in the retail environment (compared to the wholesale environment),

Amazon's features, services, and technologies become increasingly important for companies

seeking to transition to or add a retail focus to its business.  Moreover, so long as the

participating businesses follow Amazon's qualifying rules, the nature and format of Amazon's

TPOM allow a small business to compete against larger enterprises based on product features,

price, and other indicia of value, to the consumers' ultimate benefit.  Further, an injunction is

justified as the conduct, acts, and practices of MLBP and Fanatics have harmed competition and

are designed to drive Plaintiff and other Class members out of the business of e-commerce retail

sales of MLB Licensed Products.

## VIII.  <u>CLASS ACTION ALLEGATIONS</u>

### A.      **Class Definition**

155.    Plaintiff brings this action seeking equitable relief under sections 1, 2, and 3 of the

Sherman Act, 15 U.S.C. §§ 1-3, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26,

on behalf of itself and, under Federal Rules of Civil Procedure 23(a) and (b)(2), on behalf of the following Class:

> All entities or persons in the United States (including its territories and the District of Columbia) prohibited from selling MLB Licensed Products through Third Party Online Marketplaces or directly to Amazon for resale, due to the implementation of MLB's third-party online marketplace policy or similar policies, from January 1, 2016, through such time as the unlawful conduct ceases.

156.    The Class excludes the Defendants, any entity in which Defendants have a controlling interest, any individual or entity that has a controlling interest in the Defendants, as well as any of their respective officers, directors, legal representatives, successors, assigns, and any of their co-conspirators.

157.    Plaintiff reserves the right to revise the class definition based upon information learned through discovery.

### B.    Class Certification Requirements Under Rule 23

158.    The Rule 23 requirements are satisfied as to the Class for very similar reasons.  In the interests of efficiency, this Complaint addresses the Class jointly.

159.    **Numerosity: Rule 23(a)(1)**.  The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  Plaintiff is informed and believes that the Class members number in the hundreds, if not more.  Further, the Class is readily identifiable from information available and in the possession of Defendants.  Class members may be notified of the pendency of this action by recognized methods, which may include U.S. mail, electronic mail, internet postings, social media, and publication.

160.    **Commonality: Rule 23(a)(2)**.  This action involves significant common question of law and fact, including, but not limited to:

    a.    Existence and scope of the conspiracy;

b.      Impact of the conspiracy; and

c.      Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

161.    **Typicality: Rule 23(a)(3)(i).**  Plaintiff's claims are typical of those of the Class members whom it seeks to represent.  Plaintiff's claims are typical because Plaintiff and each Class member were forbidden from selling MLB Licensed Products on TPOMs and thus were similarly injured as a direct and proximate result of Defendants' same wrongful practices. Plaintiff's claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members and are based upon the same legal theories as the claims of the other Class members.  Plaintiff and Class Members were damaged by the same wrongful conduct of Defendants.

162.    **Adequacy: Rule 23(a)(4).**  Plaintiff will fairly and adequately represent and protect the interests of the Class members as required by Federal Rule of Civil Procedure 23(a)(4).  Plaintiff has retained counsel competent and experienced in complex class action litigation, including antitrust class actions.  Plaintiff intends to prosecute this action vigorously. Neither Plaintiff nor its counsel have interests that conflict with the interests of the Class members.  Therefore, the interests of the Class members will be fairly and adequately protected.

163.    **Declaratory and Injunctive Relief: Rule 23(b)(2).**  Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to each Class member as a whole.

164. **Predominance: Rule 23(b)(3).** The common questions of law and fact predominate over any questions individual to the Class members.

165. **Superiority: Rule 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties will be encountered in the management of this class action. Such treatment will permit a large number of similarly situated entities and persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not be practicably pursued individually, substantially outweighs potential difficulties in management of this class action.

166. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments. Individualized litigation further increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

167. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

168. **Ascertainability.** The Class members are readily identifiable from Defendants' records. Defendants maintain records and historical data of which Class members purchased MLB Licensed Products and were forced through collusive boycotting and the other alleged unlawful, anticompetitive activities herein to remove products from TPOMs. Defendants

necessarily collect and retain the names of each Class member, the item(s) purchased, and the Class members' billing and shipping addresses.  Even if Defendants themselves did not maintain records sufficient to identify Class members, almost all Class members will have access to electronic transactional records that can be used to prove Class membership at the appropriate stage.

## VIII.   STATUTES OF LIMITATION ARE TOLLED

### A.     Discovery Rule and Continuing Course of Unlawful Conduct

169.     Plaintiff and the Class Members did not discover and could not have discovered through the exercise of reasonable diligence that Defendants engaged in their anticompetitive conspiracy, prior to the initiation of Plaintiff and its counsel's investigation within the statute of limitations.  For example (without limitation), Plaintiff and the Class Members did not discover and could not have discovered through the exercise of reasonable diligence the collusive activity between the league, affiliated entities, teams, Fanatics, and the licensees in effectuating the group boycott and other anticompetitive schemes alleged herein, prior to the initiation of Plaintiff and its counsel's investigation within the statute of limitations.

170.     Defendants, their employees, their conspirators, and other agents regularly interact both in person at trade association meetings, other professional gatherings, and social gatherings and remotely through company or personal email, company or personal phone calls, text messages, or other messaging tools.  These meetings or communications provide them with ample opportunity to conspire without detection.

171.     Plaintiff and the Class Members could not, through exercise of reasonable diligence, have gained knowledge of the private conspiratorial conduct undertaken through

meetings, non-public business email, personal email, telephonic conversations, text messages, or other messaging tools.

172.    Any statutes of limitation otherwise applicable to any claims asserted herein have thus been tolled by the discovery rule.

173.    Moreover, Plaintiff alleges a continuing course of unlawful conduct by the Defendants, including conduct within the applicable limitations periods.  That conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

**B.    Fraudulent Concealment**

174.    All applicable statutes of limitation have been tolled by Defendants' knowing, active, and ongoing fraudulent concealment of the facts alleged herein.

175.    Defendants made numerous fraudulent statements to create the false appearance of competition and to conceal the existence of their conspiracy.  For example:

a)    The MLB Defendants hide from the public the fact that the anticompetitive policies alleged herein are enforced in collusive fashion only against companies that are not part of the alleged conspiracy.

b)    Mr. Rubin has publicly stated that products like what Fanatics sells cannot be found on Amazon because those products are "unique."  In truth, similar products are being collusively taken down from Amazon because of the collusion alleged herein.

c)    The MLB Defendants' representations that restrictive licensing agreements are necessary to prevent the sale of counterfeit or unlicensed items concealed the anticompetitive intent of the TPOM Policy behind a façade of concern for protecting valuable intellectual property.  The MLB's ODP does not reduce the presence of counterfeit goods in a manner that is narrowly tailored to accomplish that goal.  Rather than reducing the presence of

counterfeit goods, Defendants' concerted action is targeted not at pirates, but, by definition, at those legitimate entities who are reselling officially licensed products sold by approved licensees. Plaintiff does not sell counterfeit goods, has never been accused of selling counterfeit goods, and has no intention of selling counterfeit goods in the future. The MLB decides who receives a license in the first instance; subsequent transactions on TPOM do not invalidate the license.

d)    Defendants impose anticompetitive agreements on smaller co-competitors that include, among other restrictive provisions, requirements that the individual counterparty keeps the existence and terms of the agreement strictly confidential.

176.    Defendants were motivated to keep their conduct secret because, if exposed, it not only could have led to private lawsuits, but also would have diminished Defendants' reputation, harmed the value of their respected brands, and impaired their ability to extract premiums based on that reputation.

177.    The MLB places restrictions on entities wanting to sell MLB Licensed Products by preventing them from using any trademarks associated with the MLB or its member teams in connection with paid searches on Internet search engines (e.g., Google, Yahoo!). This policy is, in fact, self-concealing as the operation of the policy means that consumers cannot acquire knowledge that competing retailers are even offering MLB Licensed Products for sale.

178.    Plaintiff had no knowledge of, nor any reason to suspect the existence of, the conspiracy because Defendants affirmatively concealed its existence. Defendants enforced the conspiracy through business communications among themselves and with licensees of MLB Licensed Products rather than in publicly accessible statements or actions.

179.     Plaintiff diligently investigated its claims.  Because information regarding Fanatics and horizontally competing licensees' critical roles was not publicly available, it was only upon obtaining access to non-public information that Plaintiff had sufficient information to initiate this suit.

180.     Defendants did not disclose their misconduct and, in fact, actively concealed it.

181.     Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and concealment of the facts alleged herein.

## IX.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Sherman Act § 1 – Conspiracy in Restraint of Trade
### (As to All Defendants)

182.     Plaintiff hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

183.     Defendants' conduct violates Section 1 of the Sherman Act, which prohibits every "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," whether foreign or domestic.  15 U.S.C. § 1.

184.     Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act to unlawfully restrict competition between online retailers of MLB Licensed Products on TPOMs. As part of this conspiracy, Defendants undertook a coordinated campaign designed to exclude Plaintiff and other similarly situated competitors from selling MLB Licensed Products on TPOMs and otherwise disadvantage competing retailers.  By these actions, Defendants conspired to artificially fix, raise, stabilize, or maintain the prices of these products, to end price competition, to limit or reduce product availability, to limit or reduce output, and to limit or

reduce competition in the U.S. in violation of Section 1 of the Sherman Act.  The conduct of Defendants described throughout this Complaint constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  In the alternative, the conduct violates Section 1 under the "quick look" or "rule-of-reason" standard because Defendants' agreements harmed competition in the Relevant Antitrust Market.  The agreements provided no procompetitive benefits and, even if they did, the anticompetitive effects of the agreements substantially outweighed any asserted procompetitive effects and/or were not the least restrictive method to achieve any such procompetitive benefits.  These agreements serve no legitimate or pro-competitive purpose that could justify their anti-competitive effects.  They unreasonably restrain competition.  And the restraints described herein are substantially more restrictive than necessary to achieve any procompetitive ends.

185.    Defendants' conduct affects interstate commerce.

186.    Defendants' conduct has substantial anticompetitive effects, including but not limited to decreased output, stabilized or increased prices, and diminished quality of service.

187.    Plaintiff and the Class members have been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were meant to prevent.  Plaintiff and the Class members have suffered and continue to suffer damages and irreparable injury.

188.    On behalf of itself and Class Members, Plaintiff seeks injunctive relief barring the Defendants from engaging in the anticompetitive conduct alleged herein, under Clayton Act § 16, 15 U.S.C. § 26.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## SECOND CAUSE OF ACTION
### Sherman Act § 2 – Monopolization
### (As to All Defendants)

189.    Plaintiff hereby incorporates by reference the allegations of each of the preceding

paragraphs as if fully set forth herein.

190.    Defendants' conduct violates Section 2 of the Sherman Act, which prohibits the

"monopoliz[ation] [of] any part of the trade or commerce among the several States, or with

foreign nations . . . ."  15 U.S.C. § 2.

191.    The Relevant Antitrust Market is a valid antitrust market.

192.    MLBP possesses monopoly power over the Relevant Antitrust Market.

193.    Fanatics possesses monopoly power over the Relevant Antitrust Market.

194.    MLBP has unlawfully acquired and/or maintained monopoly power over the

Relevant Antitrust Market through the anti-competitive acts described herein.

195.    Fanatics has unlawfully acquired and/or maintained monopoly power over the

Relevant Antitrust Market through the anti-competitive acts described herein.

196.    Defendants' conduct affects interstate and foreign commerce.

197.    Defendants' conduct has substantial anti-competitive effects, including but not

limited to: reducing the number of entities on TPOMs that compete in the market for online retail

sales of MLB Licensed Products; creating a barrier to entry to the market for online retailing

MLB Licensed Products on TPOMs; artificially decreasing the selection, product quality, and

service quality associated with retailing MLB Licensed Products; establishing a single licensee

as the dominant and exclusive or near-exclusive e-commerce retailer of MLB Licensed Products;

interfering with the types of and quality of MLB Licensed Products that Plaintiff and Class

members can retail on TPOMs; and interfering with the use of phrases associated with the MLB

and its member Clubs when promoting unaffiliated e-commerce destinations via, for example, Google AdWords or similar search technologies.

198.    As entities and individuals that previously retailed but have now been prevented from or hindered in retailing MLB Licensed Products on TPOMs, Plaintiff Casey's and the Class members have been directly and proximately harmed in their respective businesses or properties by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that the antitrust laws were intended to prevent.

199.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury by Defendants' anticompetitive conduct.  As described herein, the damages and irreparable injury suffered by Plaintiff and the Class members cannot be completely relieved through remedies at law.  Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

### THIRD CAUSE OF ACTION
### Sherman Act § 2 – Attempted Monopolization
### (As to All Defendants)

200.    Plaintiff hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

201.    Defendants' conduct violates Section 2 of the Sherman Act, which prohibits the "attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations . . . ."  15 U.S.C. § 2.

202.    The Relevant Antitrust Market is a valid antitrust market.

203.    The conduct engaged in by Defendants as further described herein was anticompetitive in that it prevented the normal competitive forces from operating, which resulted in the advantaging of Fanatics over all or nearly all other licensees and resulted in the allowance

of one or only a very few selected entities from effectively retailing MLB Licensed Products on TPOMs.  It was additionally anticompetitive in that it thwarted or hindered Plaintiff and the Class members from selling MLB Licensed Products that had been previously listed for retail sale on TPOMs by de-listing such products from TPOMs.

204.    MLBP possessed the specific intent to monopolize the Relevant Antitrust Market as alleged herein.

205.    Fanatics possessed the specific intent to monopolize the Relevant Antitrust Market as alleged herein.

206.    Defendants' course of conduct had the dangerous probability of causing Defendants to achieve monopoly power over the Relevant Antitrust Market.  By such conduct, Defendants caused Fanatics to achieve the status of the operator of the MLB's "storefront" on TPOMs to the exclusion of all or most others and resulted in the de-listing of products by those like Plaintiff previously engaged in retail sales of MLB Licensed Products on TPOMs.

207.    Through their course of conduct, Defendants attempted to monopolize the Relevant Antitrust Market, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

208.    Defendants' conduct affects interstate and foreign commerce.

209.    Defendants' conduct has substantial anti-competitive effects.

210.    As entities and individuals that previously retailed but have now been prevented from or hindered in retailing MLB Licensed Products on TPOMs, Plaintiff Casey's and the Class members have been directly and proximately harmed in their respective businesses or properties as alleged herein by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that the antitrust laws were intended to prevent.

211.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury by Defendants' anticompetitive conduct.  As described herein, the damages and irreparable injury suffered by Plaintiff and the Class members cannot be completely relieved through remedies at law.  Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

## FOURTH CAUSE OF ACTION
### Sherman Act § 2 – Conspiracy to Monopolize
### (As to All Defendants)

212.    Plaintiff hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

213.    Defendants' conduct violates Section 2 of the Sherman Act, which prohibits the "combin[ation] or conspir[acy] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ."  15 U.S.C. § 2.

214.    Defendants engaged in concerted action that included overt acts that furthered the conspiracy entered into with the specific intent to achieve an unlawful monopoly.

215.    The Relevant Antitrust Market is a valid antitrust market.

216.    Defendants entered into and engaged in a continuing combination, conspiracy, and/or agreement to acquire, maintain, and/or enhance Fanatics's monopoly in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) by engaging in the conduct alleged herein.

217.    Defendants engaged in these acts with the specific intent of eliminating competition on the merits for retailing MLB Licensed Products on TPOMs, and thereby installing and protecting Fanatics as the sole or dominating force in e-commerce sales of MLB Licensed Products, including the e-commerce sales of MLB Licensed Products on TPOMs. Defendants' conduct violates Section 2 of the Sherman Act (15 U.S.C. § 2).

63

218.    Defendants' conduct affects a substantial volume of interstate and foreign commerce.

219.    Defendants' conduct has substantial anti-competitive effects as alleged herein.

220.    Plaintiff Casey's and the Class members have been directly and proximately harmed in their respective businesses or properties as alleged herein by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that the antitrust laws were intended to prevent.

221.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury by Defendants' anticompetitive conduct.  As described herein, the damages and irreparable injury suffered by Plaintiff and the Class members cannot be completely relieved through remedies at law.  Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, on behalf of itself and the Class Members, Plaintiff respectfully requests that the Court:

a.    grant certification of this case as a class action on behalf of the Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), appointment of Plaintiff as class representative, and appointment of its attorneys as Class Counsel;

b.    grant equitable relief as necessary to correct the anticompetitive market effects caused by MLBP's and Fanatics's unlawful conduct, consistent with the following:

> Neither Defendant MLBP, Defendant Fanatics, nor other Defendants shall implement or enforce any collusive policy, whether drafted, implemented, or enforced by Defendant MLBP, Defendant Fanatics, or other Defendants, that hinders, limits, prevents, or prohibits an individual or entity from selling

legitimately purchased MLB Licensed Products on or through a third-party online marketplace, including, without limitation, that operated by Amazon, even in the event that such an individual or entity has not previously obtained written permission from Defendant MLBP, Defendant Fanatics, or other Defendants to do so;

c.     declare that Defendants' actions violate the antitrust and other laws;

d.     award reasonable costs of this action, including but not limited to attorneys' fees; and

e.     award of such other relief that the Court deems just, reasonable, and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as allowed by law.

Dated:  June 9, 2022                    **NEMATZADEH PLLC**

By:*/s/ Justin S. Nematzadeh*
Justin S. Nematzadeh
101 Avenue of the Americas, 9th Floor
New York, NY 10013
Telephone: (646) 799-6729
Email: jsn@nematlawyers.com

**CERA LLP**
Solomon B. Cera
Thomas C. Bright
595 Market Street, Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Email: scera@cerallp.com
Email: tbright@cerallp.com

**KOHN SWIFT & GRAF, P.C.**
William E. Hoese
Craig W. Hillwig
Zahra R. Dean
1600 Market Street, Suite 2500
Philadelphia, PA 19103-7225
Telephone: (215) 238-1700
Email: whoese@kohnswift.com
Email: chillwig@kohnswift.com
Email: zdean@kohnswift.com

*Attorneys for Plaintiff and the Proposed Class*